IN MATTER OF GUARDIANSHIP & PROTECTIVE PLACEMENT OF SHAW: ZANDER, Guardian ad Litem, Appellant, v. COUNTY OF EAU CLAIRE, Respondent.

Court of Appeals

*No. 77–413. Argued September 21, 1978.—*
*Decided January 3, 1979.*
(Also reported in 275 N.W.2d 503.)

504

For the appellant the cause was argued by *Thomas K. Zander,* assistant state public defender, with whom on briefs was *Howard B. Eisenberg,* state public defender.

For the respondent there was a brief and oral argument by *William G. Thiel,* corporation counsel for Eau Claire County.

Before Dean, P.J., Donlin, J., and Foley, J.

DEAN, P.J.   The order appealed from directed the appointment of a guardian for the person and property of James R. Shaw, ordered that he be protectively placed in the Eau Claire Area Health Care Center, and directed that he be placed in a locked ward. This action was commenced with the filing of a petition for guardianship and protective placement by Gary Joslin, a social worker with the Eau Claire Area Health Care Center.

At the final hearing on this petition, Joslin testified that Shaw was a 69-year-old alcoholic who had been admitted to the Health Care Center thirty-five times over

the preceding two years for detoxification. Joslin testified that Shaw was belligerent and hostile when he was drunk and that, on one occasion, he set fire to a pillow while in four-point restraints. Shaw was twice convicted of disorderly conduct during this period. When sober, Shaw was bright, alert, and pleasant, and indicated that he wished to quit drinking.

Shaw received a monthly veteran's check from which he paid $150 to the Health Care Center while he was a resident in their nursing home, leaving him $35 for personal use. On one occasion, when he was not a resident there, Shaw lost or spent $138 of the $185 he received the day before. He could not account for the missing money except that he paid some of it for bail and some for drinking. Shaw has no dependents.

Joslin testified that Shaw had a "primary need for residential care and custody" based primarily on the number of admissions to the Health Care Center, and his observation that when Shaw was released without supervision, he "lost or has not had control regarding making decisions about drinking." Joslin did not explain how he acquired the information that Shaw lost control over his decision-making process rather than that he simply decided to resume and continue drinking. He further testified that without residential care and custody Shaw "would be totally incapable of providing for his own care and custody" based upon his alleged inability to provide for himself over the previous two years. Joslin testified that Shaw posed a substantial risk of harm to himself or to others because his belligerent attitude could lead to bar fights in which someone could get injured. Joslin proposed a continuation of treatment in a locked nursing home with gradually increased liberties.

Shaw's probation officer testified that Shaw had been beaten up on two occasions. He also testified that depri-

vation of funds was not sufficient to prevent Shaw from drinking because "if there is a will, there is a way."

The associate director for alcohol and drug abuse of Eau Claire County Unified Services Board testified that Shaw had unsuccessfully participated in unspecified, short-term, active treatment programs, apparently for never longer than thirty days. He testified that he believed no "unrestricted community resource alternative" would suffice because it "appeared [that Shaw was] unable to control his drinking . . . , and that he has not responded to those [programs] that he has participated in." Shaw failed to keep appointments for outpatient treatment and did not attend Alcoholics Anonymous meetings. No halfway house would accept Shaw "because of his drinking patterns and his insincerity about discontinuing his drinking."

Medical evidence was presented by two doctors. Dr. Jack Edson, a court-appointed psychiatrist, performed an independent evaluation of Shaw, pursuant to sec. 55.06 (8), Stats. In his report he stated:

On the basis of this examination, I would have to conclude that Mr. Shaw is in no way incompetent from the general psychological standpoint. Although there is apparently some early deterioration of thought processes, this has not expanded to the point that it would interfere with his day to day mental functioning. Historically, of course, he apparently has a pronounced problem with alcohol which would indicate more deeply underlying problem dynamics not immediately evidenced in such a session as this. Thus, he may well be in need of guardianship and protection because of his pronounced tendency towards alcoholism and the resulting effects that this has wrought. I can only at this time evaluate him in a period of sobriety and this does find him to be a fairly capable, intelligent, and basically competent individual. Any finding of incompetency will have to be in terms of his drinking history and the direct manifest effects of this.

Dr. Phillip Schleifer, the medical director for the Health Care Center who had no psychiatric training, agreed that Shaw was competent when sober, but testified that Shaw lacked control over his drinking, and that his drinking led to "completely irrational behavior." "He has no sense of well-being for himself or for people around him." When asked whether the number of Shaw's admissions to the Health Care Center indicated that his alcoholic condition rendered him incompetent, Dr. Schleifer answered that there was a correlation between number of admissions and lack of control over drinking. When asked whether, absent controls, Shaw was totally incapable of providing for his own care and custody in the community, Dr. Schleifer responded, "Based on [Shaw's] behavior in the past year, I would say he would have no control." When asked whether, absent controls, Shaw's intoxication or incapacitation would constitute a substantial risk of serious harm to himself or others, Dr. Schleifer answered, "Yes. It's a potential problem."

Finally, Dr. Schleifer testified that he was optimistic that Shaw "will eventually be able to corner his problem with alcohol," unless he is permitted to continue to live as he had for the previous two years. He declined to describe Shaw's condition as permanent, but stated that it "could be" permanent, and that his prognosis was poor absent supervision. He suggested a "fairly structured, long-term treatment." Further facts will be stated as needed in the opinion. Six issues are raised in this appeal:

(1) Was sufficient evidence presented to justify the protective placement of Shaw.

(2) Are the criteria for guardianship and protective placement excessively vague and overbroad.

(3) Does application of the clear-and-convincing-evidence test violate due process or equal protection of law.

(4) Does the failure of the statute to require periodic, automatic court reexaminations violate due process or equal protection of law.

(5) Is the guardianship statute unconstitutional in that it allows a general finding of incompetency rather than limited incompetency to perform specific acts.

(6) Does the constitutional right to privacy protect an individual from state interference with his chosen life style where that life style includes habits which are detrimental to his health.

## SUFFICIENCY OF EVIDENCE

Section 55.06, Stats., provides for the protective placement of a ward for the primary purpose of providing care and custody, following a determination of incompetency in accordance with ch. 880, Stats. The interpretation of the protective placement statutes is a matter of first impression. These statutes require that before a person may be protectively placed because of alcoholism, the following findings must be made:

(1) That the individual to be placed is incompetent;

(2) That he has a primary need for residential care and custody;

(3) That, as a result of brain damage or continued consumption of alcohol, he is so totally incapable of providing for his own care or custody that his condition creates a substantial risk of serious harm to himself or others;

(4) That his disability is permanent or likely to be permanent.

The principle source for construction of these requirements is the language of the statutes themselves. *E.g., Wisconsin Environmental Decade, Inc. v. Public Service Commission*, 81 Wis.2d 344, 260 N.W.2d 712 (1978). We must also consider the total legislative scheme relat-

ing to alcoholics, and harmonize sec. 55.06, Stats., with other statutes dealing with alcoholics.[1]  *E.g. McGraw-*

[1] The primary statute relating to care and custody of alcoholics is sec. 51.45(13), Stats., which in relevant part provides:

(a) A person may be committed to the custody of the community board by the county court upon the petition of 3 adults, each of whom has personal knowledge of the conduct and condition of the person sought to be committed. A refusal to undergo treatment shall not constitute evidence of lack of judgment as to the need for treatment. The petition for commitment shall:

1. Allege that the condition of the person is such that he or she habitually lacks self-control as to the use of alcoholic beverages, and uses such beverages to the extent that health is substantially impaired or endangered and social or economic functioning is substantially disrupted;

2. Allege that such condition of the person is evidenced by a pattern of conduct which is dangerous to the person or to others;

3. State facts sufficient for a determination of indigency of the person; and

4. Be supported by the affidavit of each petitioner which avers with particularity the factual basis for the allegations contained in the petition.

. . .

(g) The court shall make an order of commitment to the community board if, after hearing all relevant evidence, including the results of any diagnostic examination, the trier of fact finds: 1) that the allegations of the petition under par. (a) have been established beyond a reasonable doubt; and 2) that there is a relationship between the alcoholic condition and the pattern of conduct during the 12-month period immediately preceding the time of petition which is dangerous to the person or others and that such relationship has been established to a reasonable medical certainty; and 3) that there is an extreme likelihood that the pattern of conduct will continue or repeat itself without the intervention of involuntary treatment or institutionalization. The court may not order commitment of a person unless it is shown beyond a reasonable doubt that there is no suitable alternative available in which the person will voluntarily participate and that the community board is able to provide the most appropriate treatment and that the treatment is likely to be beneficial.

(h) A person committed under this subsection shall remain in the custody of the community board for treatment for a period of

*Edison Co. v. Department of Industry Labor and Human Relations*, 72 Wis.2d 99, 240 N.W.2d 148 (1976).

Based upon these principles, we construe the protective placement statutes as follows: The requirement of

30 days. During this period of commitment the community board may transfer the person from one approved public treatment facility or program to another as provided in par. (k). At the end of the 30-day period, the person shall be discharged automatically unless the community board before expiration of the period obtains a court order for recommitment upon the grounds set forth in par. (a) for a further period of 90 days. If after examination it is determined that the person is likely to inflict physical harm on himself or herself or on another, the community board shall apply for recommitment.

(i) A person recommitted under par. (h) shall be discharged at the expiration of the 90-day period unless the community board, before expiration of the period, obtains a court order on the grounds set forth in par. (a) for recommitment for a further period not to exceed 90 days. If after examination it is determined that the person is likely to inflict physical harm on himself or herself or on another, the community board shall apply for recommitment. Only 2 recommitment orders under this paragraph and par. (h) are permitted.

. . .

(k) The community board shall provide for adequate and appropriate treatment of a person committed to its custody. Any person committed or recommitted to custody may be transferred by the community board from one approved public treatment facility or program to another upon the written application to the community board from the facility or program treating the person. Such application shall state the reasons why transfer to another facility or program is necessary to meet the treatment needs of the person. Notice of such transfer and the reasons therefor shall be given to the court, the person's attorney and the person's immediate family, if they can be located.

. . .

(m) A person committed under this section may at any time seek to be discharged from commitment by writ of habeas corpus under s. 292.01(2).

. . .

secs. 55.06(1) and (2)(b), Stats., that the individual to be placed must first be found incompetent under ch. 880 necessitates a finding that he is incapable of managing his property or caring for himself. More than a finding that the individual is a drinking alcoholic is required before a person may be found incompetent for the purposes of sec. 55.06, Stats. The court must find that he is not capable of making a knowing and voluntary choice about his drinking. An alcoholic who continues to drink because he prefers an alcoholic lifestyle is not necessarily incompetent. Incompetency addresses the ability of the individual to make decisions for himself. The decision which he knowingly and voluntarily makes is not at issue so long as he possesses the evaluative capacity to choose between continued drinking and the various treatment and placement alternatives. The incompetency statutes do not allow the court to substitute its judgment for that of the alleged incompetent merely because the court believes he has made the wrong decision. The question of his competency to make decisions relating to continuation of his alcoholic life-style, however, is restricted to his competency when he is sober.

Upon a finding of incompetency to make decisions relating to drinking, the court must appoint a guardian of the individual's property and/or person, consistent with the doctrine of least restrictive alternative. Sec. 55.001, Stats., *See generally, Shelton v. Tucker,* 364 U.S. 479, 488 (1960). Where the individual, when intoxicated, is incompetent to perform other legally significant acts, and chooses to continue his alcoholic life-style, the court may terminate those specific rights under sec. 880.33 (3), Stats. Where the individual is protectively placed or is otherwise prevented from drinking, the court should reinstate those rights which were terminated under sec. 880.33(3) for which he is no longer incompetent.

Section 55.06(2)(a), Stats., requires that an alcoholic must have a primary need for residential care and custody before he may be protectively placed. This dictates a finding that his primary need is for protective placement rather than for active treatment or protective services. To allow protective placement under ch. 55 of a person in need of treatment would render sec. 51.45(13), Stats., meaningless, and emasculate its protective features. In determining whether the individual has a primary need for protective placement, the court must consider the availability of treatment or protective services, and order protective placement only if it is the least restrictive alternative.

The Wisconsin Department of Health and Social Services, *Guidelines for the Wisconsin Protective Services System,* distinguishes "later-stage alcoholics" from "revolving door alcoholics."[2] While a "later-stage alcoholic" is probably in need of protective placement, not all "revolving door alcoholics," (those who are repeatedly detoxified and occasionally committed for treatment under sec. 51.45(13), Stats.) have a primary need for residential care and custody.

The third precondition to protective placement of an alcoholic requires that his condition makes him so totally incapable of providing for his own care and custody that it creates a substantial risk of serious harm to himself or others, sec. 55.06(2)(c), Stats. The risk of harm

---

[2] "Later-stage alcoholic" means an individual who is substantially impaired from providing for self care and custody because of long-term abuse of alcoholic beverages. Not all "revolving door" alcoholics fit the category. Those who clearly do are late chronic ("burned out") alcoholics, probably brain damaged, having various other physical problems, unable to function independently, and in need of full-time care in a secure residential setting.

must be substantial. Mere speculation as to difficulties he may encounter is not sufficient. Specific harm must be foreseeable to fulfill this requirement. Furthermore, the foreseeable harm must be serious. The minor accidents, injuries and illness are not sufficient to satisfy this requirement.

Finally, the trial court must find that the disability is permanent or likely to be permanent, sec. 55.06(2)(d), Stats. This requirement is satisfied by a finding that the individual is not treatable by presently known methods. It is not sufficient to find that his alcoholism is permanent or likely to be permanent. Rather, his inability to care for himself due to the effects of alcoholism must be permanent or likely to be permanent. It is not sufficient that his inability to care for himself is likely to become permanent in the future. If the individual can be treated under sec. 51.45(13), Stats., with a reasonable likelihood of success, the legislature intended that that statute be used to force treatment rather than ch. 55.

The mere fact that an individual has failed to respond to treatment in the past does not necessarily indicate untreatability or permanence. Unsuccessful treatment is commonplace, even for alcoholics who are treatable and eventually stop drinking. While the failure to respond to past treatment is not dispositive of the question, it is a relevant factor in determining permanency. Except in the most unusual cases, a court should not find his condition permanent unless he has failed to respond to all available treatment procedures and, in the opinion of competent medical authorities, is not reasonably likely to respond in the future.

We also note that sec. 51.43(13)(h) and (i) limits the time for continuous, active, involuntary treatment of alcoholics to 210 days. The mere fact that the time allowed

for continuous, active treatment has expired is not sufficient to support a conclusion that his incompetency due to alcoholism is permanent. Statutory time limits on treatment are not dispositive of the question of whether the disability is "permanent or likely to be permanent."

At the close of this case the trial court commented that the "time limits (under sec. 51.45 (13) ) are obviously too short . . . , to adequately treat the true alcoholic." The court noted that Shaw was not incompetent when sober, i.e., he was "orientated as to time and place," but was incompetent, absent restraints, "to handle his own affairs; both as to money, which is not particularly important in this case because of the amount of it . . . , and from a common sense point of view to take care of himself." The court found him to be dangerous to himself because he "got belted by somebody," and because he exhibited a "dangerous tendency when he set the pillow on fire." The court then concluded:

> I'm not going to review all of the evidence that has gone in all morning or the evidence that has gone in on prior occasions when Mr. Shaw was before this Court. It's all part of the record. I'm going to find that he is incompetent based on this record; and I don't know if there is such a standard, but I guess what I would designate as a common sense finding of incompetency. Anyone that can—if, for example, the Supreme—if this matter were to go to the Supreme Court, if they would determine that based on the record that Mr. Shaw is competent, that is their prerogative; but I find that he apparently cannot handle his money, what little money was allowed to him when he was released to go downtown into the community. It was probably spent or misplaced. As far as a guardian of his person, it is obvious that someone is going to have to look after Mr. Shaw.

The court then found that placement in a locked nursing home was the "least restrictive plan that could be used at this time." The court authorized the Unified Services Board to release him from the locked ward

"provided, however, that if and when he were to abuse alcohol and become intoxicated and/or incapacitated by the same, upon such a release, he shall be returned to the locked ward."

We recognize the difficulties presented by this case and sympathize with the trial court in its attempt to find a solution for the problems it experienced in attempting to do what it felt was in the best interests of Mr. Shaw and society. This is a particularly difficult decision because the court was without direction in its construction and implementation of a new statutory method for dealing with alcoholics. However, the findings of fact made by the trial court, in light of our opinion, are inadequate to allow review of the sufficiency of the evidence. The court did not separately state its findings of fact and conclusions of law, and did not indicate how the evidence supported its conclusions.

To facilitate review on appeal, specific findings should be made as to whether Shaw was incapable of caring for himself, or merely unwilling to do so; which rights Shaw is incompetent to exercise and under what circumstances; whether Shaw was capable of making a knowing and voluntary choice regarding his drinking when he was sober; what specific needs of Shaw made protective placement in a locked nursing home the least restrictive alternative; what substantial risk of serious harm Shaw presented, and whether Shaw's disability was permanent or likely to be permanent. These findings must be made on the evidence presented at the hearing, and not from sources outside the record.

The trial court's "common sense findings" are inadequate. While "common sense findings" appear to have been legitimatized in literature on protective placement,[3]

---

[3] *See,* Center for Public Representation Chapter 55: *The Protective Services Laws and Its Application* (February, 1978) 32:

we expressly reject application of that approach. We hold the statute requires specific findings which may not be usurped by the application of unauthorized tests for incompetency. The trial court's test of "orientation in time and place," for example, is not a permissible test for competency under the statutes.

When confronted with inadequate findings by the trial court, we may affirm if the trial court's conclusions are supported by the great weight and clear preponderance of the evidence; reverse if they are not so supported; or remand the cause for the purpose of making appropriate findings of fact and conclusions of law. *Perrenoud v. Perrenoud*, 82 Wis.2d 36, 260 N.W.2d 658 (1978). Because of ambiguities in the testimony,[4] and questionable

---

The legal definition of incompetency is not terribly specific; it purposely does not suggest types of behavior or incapacities which warrant a finding of legal incompetency. Evidence of the actions (or inactions) of the alleged incompetent which suggests that s/he cannot make proper decisions must be presented to the judge. Part of this evidence must be reports from a physician and/or psychologist who has examined the person in terms of competency (sec. 880.33(1)). With this evidence before him or her, the judge must make what is in essence a common-sense determination as to whether the person is truly capable of managing his or her life in a rational manner. Different judges apply different standards when making such a decision. Some tend to view "self-destructive" behavior as evidence *per se* of incompetency.. Others look at whether the person is able to weigh alternatives, and may find that this is so even if the individual has embarked on a course of action that is potentially self-destructive.

We reject not only the "common sense determination" approach, but also the view that where the "self-destructive behavior" consists of drinking, it is evidence *per se* of incompetency.

[4] The testimony of Dr. Schleifer appears to have been directed to the requirements for involuntary treatment of alcoholics under sec. 51.45(13)(a), as was his recommendation for further treatment.

foundation for some of the statements made, we are unable to conclude that the evidence supports any of the elements required for protective placement. We attribute these ambiguities to the fact that no legal definition of the terms of the statute was available to the witnesses. Since without the aid of specific findings of fact by the trial court we are unable to find support for the trial court's conclusions, we must reverse and remand this case for findings by the trial court and, if deemed necessary by the court, an additional evidentiary hearing to resolve these ambiguities.

## CONSTITUTIONAL ISSUES

The appellant has raised a number of constitutional issues, some of which have substantial merit. We decline to decide any of the constitutional issues raised in this appeal for three reasons. First, our interpretation of the statutes obviates several of the constitutional questions. Second, we will not decide constitutional questions where a case may be disposed of on other grounds. *E.g., State v. State Fair Park, Inc.,* 21 Wis.2d 451, 124 N.W. 2d 612 (1963). Third, the constitutional issues depend in some measure upon medical and scientific facts which do not appear in the record, i.e., the definition of alcoholism, its treatability, medical problems it poses for the alcoholic, and how alcoholism relates to other mental, physical or social dysfunctions.

While we do not decide the constitutional issues presented on appeal,[5] we will briefly summarize some of

---

[5] Besides the issues discussed below, trial counsel raised several issues which were not pursued on appeal. First, they argued that sec. 55.06(11)(c) is unconstitutional under the *Lessard* decision because it allows placement for thirty days pending the hearing for permanent placement. Second, they argued that a person alleged to be in need of protective placement should have the

the arguments to facilitate trial court treatment of the questions presented.

## STANDARD OF PROOF

The appellant argues that the clear-and-convincing-evidence standard violates due process of law. The due process argument is supported by *Lessard v. Schmidt,* 349 F. Supp. 1078, 1095 (E.D. Wis. 1972) which found that because a civilly committed individual "will be deprived of basic civil rights and be certainly stigmatized . . . , the State must prove beyond a reasonable doubt all facts necessary to show that an individual is mentally ill and dangerous."[6] The appellant argues that the deprivation of civil rights and stigmatization resulting from protective placement of an alcoholic are comparable to those found in *Lessard,* requiring a higher standard of proof. *See e.g., Powell v. Texas,* 392 U.S. 514, 539 (1968). *In re Ballay,* 482 F.2d 648, 668–69 (D.C. Cir. 1973) ; *Dale v. Hahn,* 441 F.2d 633, 636 (2d Cir. 1971).

The respondent argues that the clear-and-convincing-evidence standard is justified because the interests of the person to be placed is, on balance, not as great as the state's interest in assuring that a disabled person is able

right against self-incrimination. Appellant also does not argue the question of whether the trial court may delegate its authority to recommit a patient to a locked facility who has been transferred to an unlocked facility without court approval under sec. 55.06(9).

[6] *Accord, In re Ballay,* 482 F.2d 648 (D.C. Cir. 1973) ; *Suzuki v. Quisenberry,* 411 F. Supp. 1113 (D. Haw. 1976) ; *In re Pickles Petition,* 170 S.2d 603 (Fla. App. 1965) ; *Proctor v. Butler,* 380 A.2d 673 (N.H. 1977) ; *Ex Parte Perry,* 137 N.J. Eq. 161, 43 A.2d 885 (1945).

*Contra, French v. Blackburn,* 428 F. Supp. 1351 (M.D.N.C. 1977) ; *Stamus v. Leonhardt,* 414 F. Supp. 439 (S.D. Iowa 1976) ; *Doremus v. Farrell,* 407 F. Supp. 509 (D. Neb. 1975) ; *Lynch v. Baxley,* 386 F. Supp. 378 (M.D. Ala. 1974) ; *Dixon v. Attorney General,* 325 F. Supp. 966 (M.D. Pa. 1971).

to lead a dignified and independent life, free from exploitation, abuse, ill-treatment and self-harm, and the state's interest in protecting its citizens from these individuals.

The appellant also argues that the clear-and-convincing-evidence standard violates equal protection of law. He contends that it is irrational to allow the lesser standard of proof for placement which is likely to be permanent, but require a higher standard of proof for short-term commitments. It is anomalous that sec. 51.-45(13), Stats., (short term commitment for treatment of alcoholism), and sec. 51.20, Stats., (mental commitments) require a higher standard of proof than permanent commitment under sec. 55.06, Stats. These statutes are similar to sec. 55.06, Stats., in that they are purely civil commitments, they provide for the care and custody of the mentally disabled, and each is limited to persons whose condition creates a substantial risk of harm or dangerousness to themselves or others. Given the similarities in the commitment statutes, the appellant contends that the justification for distinguishing between the procedures for commitment under these statutes is not compelling or even rational. *Cf., Baxstrom v. Herold,* 383 U.S. 107 (1966) (commitment of prisoner near the end of his term is indistinguishable from all other commitments); *Jackson v. Indiana,* 406 U.S. 715 (1972) (persons incompetent to stand trial compared with civilly committed persons); *Humphrey v. Cady,* 405

*Cf., United States ex rel. Stachulak v. Coughlin,* 520 F.2d 931 (7th Cir. 1975); *cert. denied,* 424 U.S. 947 (1976) (civil commitment of sex offender requires proof beyond a reasonable doubt of sexual dangerousness).

*But Cf.* (reasonable-doubt standard not required) *Hollis v. Smith,* 571 F.2d 685 (2d Cir. 1978); *Tippett v. Maryland,* 436 F.2d 1153 (4th Cir. 1971) *cert. dismissed sub nom. Murel v. Baltimore City Court,* 407 U.S. 355 (1972).

U.S. 504 (1972) (equal protection requires jury trial for sex crimes commitment); *State ex rel. Farrell v. Stovall,* 59 Wis.2d 148, 207 N.W.2d 809 (differences between sex crimes commitment and civil commitment insufficient to justify procedural differences); *State ex rel. Kovach v. Schubert,* 64 Wis.2d 612, 219 N.W.2d 341 (1974) (equal protection applied to commitment procedures following insanity acquittal). The appellant argues that Shaw's liberty interest is a fundamental right requiring that distinctions which restrict that right be justified by a compelling state interest. *Kramer v. Union Free School District No. 15,* 395 U.S. 621 (1969); *Shapiro v. Thompson,* 394 U.S. 618 (1969).

## *PERIODIC, AUTOMATIC COURT RE-EXAMINATION*

The appellant argues that the procedures under sec. 55.06(10), Stats., which require periodic agency review of the need for commitment and allow periodic rehearing by the committing court are constitutionally defective in that: (a) reexaminations are not automatic but must be petitioned for; and (b) the burden of proof is on the ward to show that the conditions which warranted placement are no longer present. The appellant argues that under *O'Connor v. Donaldson,* 422 U.S. 563, 573 (1975), a commitment cannot constitutionally continue after the basis for commitment no longer exists. *See also, Jackson v. Indiana, supra.* The state, therefore, should be required to periodically prove the need for continued commitment.

The appellant further argues that equal protection requires periodic rehearing. Under sec. 51.45(13), Stats., a person committed for treatment of alcoholism may be committed for only a thirty-day period, which may be extended for two additional ninety-day periods only by holding an additional hearing at which the state must

prove the need for additional treatment beyond a reasonable doubt. The appellant argues that the distinction between the procedures of sec. 51.45(13), Stats., and sec. 55.06(10), Stats., are irrational and arbitrary.

The respondent contends that safeguards of sec. 55.06 (10), Stats., are adequate. Besides the required review by the agency responsible for protective placement, the statute allows the agency, guardian, or ward to petition for release, which petition must be heard if no court has held such a hearing within six months. At this hearing, the respondent argues, the burden of proving the continued need for placement rests with the custodian. The ward will also be immediately released upon termination of guardianship and, potentially, upon a finding of limited incompetency under sec. 880.33(3), Stats. These procedures, the respondent argues, are sufficient to satisfy due process requirements, and sufficiently comparable to other procedures to survive an equal protection analysis.

## RIGHT TO PRIVACY

The appellant argues that the state has no compelling interest in forcing health care decisions on an unwilling person, particularly when that person is capable of weighing the relative merits for himself. He argues that the individual has a constitutionally protected privacy right to make health care decisions for himself so long as he does not endanger others. *Griswold v. Connecticut,* 381 U.S. 479 (1965). The appellant contends that, like a decision of a cancer patient to discontinue treatment or a person's decision to continue smoking or over-eating, a decision to continue to drink despite health problems is not one which the state has the power to overrule. A person of advanced years with no dependents, he argues, is entitled to lead a self-injurious life-style so long as he has the capacity to weigh its relative costs and benefits.

The respondent argues that there is a compelling state interest in protecting an individual from his own folly, justified under the police powers. The procedures for treatment and placement of alcoholics represents a substantial financial and moral commitment by the state to prevent self-destructive acts, whether actively or passively injurious to an individual. To use involuntary treatment and placement to provide for the health, safety, morals and general welfare of the alcoholic, it is argued, is sufficient reason to constitute a compelling state interest.

We decline to decide any of these constitutional issues on the record before us. The order of the county court is reversed, and the cause remanded for findings by the trial court consistent with this opinion, and, if deemed necessary, further evidentiary hearings.

*By the Court.*—Reversed and remanded with directions.