COURT OF APPEALS
DECISION
DATED AND FILED

April 24, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1871**

Cir. Ct. No. **2023GN94**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

IN THE MATTER OF THE GUARDIANSHIP OF K.K.:

LA CROSSE COUNTY,

   PETITIONER-RESPONDENT,

 V.

K.K.,

   RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for La Crosse County: MARK A. HUESMANN, Judge. *Order affirmed; order reversed.*

Before Kloppenburg, P.J., Blanchard, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. K.K. appeals orders for guardianship of his person pursuant to WIS. STAT. ch. 54 and for his protective placement pursuant to WIS. STAT. ch. 55 (2023-24).[1] In his appellate briefing, K.K. challenges only the order for his protective placement. Specifically, K.K. argues that La Crosse County failed to prove, by clear and convincing evidence, that he was so totally incapable of providing for his own care or custody as to create a substantial risk of serious harm to himself or others, as required under WIS. STAT. § 55.08(1)(c). We agree. Accordingly, we affirm the order for permanent guardianship and reverse the order for protective placement.[2]

## BACKGROUND

¶2 In December 2023, the County filed a petition for protective placement of K.K. The County also filed a psychologist's report completed by Dr. Joel Rooney, who had evaluated K.K. at the La Crosse County Care Center ("Care Center") where K.K. was residing under a WIS. STAT. ch. 51 commitment.

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] Explaining further this court's mandate, K.K.'s notice of appeal states that he is appealing both the order for guardianship under WIS. STAT. ch. 54 and the order for protective placement under WIS. STAT. ch. 55. Because K.K.'s arguments in his appellate briefing address only the protective placement order, and he seeks relief only from the protective placement order, this court affirms the guardianship order as unchallenged, addresses only the protective placement order, and reverses that order based on the County's failure to make the showing of a substantial risk of serious harm that is required by WIS. STAT. § 55.08(1)(c).

K.K. also argues that the County failed to prove, by clear and convincing evidence, that he has a primary need for residential care and custody, as required by WIS. STAT. § 55.08(1)(a). We do not address this argument because of our dispositive conclusion that the County failed to prove, by clear and convincing evidence, that he is so totally incapable of providing for his own care and custody as to create a substantial risk of serious harm to himself or others, as required by § 55.08(1)(c).

¶3      The circuit court held a hearing on the petition on January 16, 2024. The court heard testimony from the director of the Care Center, a County social worker, and Rooney. The court admitted Rooney's report into evidence. We present in the discussion below pertinent parts of each witness's testimony and Rooney's report. After considering the parties' arguments and the recommendation of the guardian ad litem (GAL), the court granted the petition for protective placement of K.K.[3]

¶4      K.K. was subsequently transferred from the Care Center to a community-based residential facility, and then to a different community-based residential facility.

## DISCUSSION

¶5      Decisions on protective placement are within the sound discretion of the circuit court. ***Anna S. v. Diana M.***, 2004 WI App 45, ¶7, 270 Wis. 2d 411,

_____

[3] Given the passage of time that is significant for the nature of the case, we now briefly explain the timeline since the circuit court issued the protective placement order on January 17, 2024. K.K. timely filed a notice of intent to pursue post-disposition relief from that order and, after receiving several extensions of time in which to file a motion or a notice of appeal, filed the notice of appeal in September 2024. After the parties completed their appellate briefing, the appeal was submitted to this court in January 2025, approximately one year after entry of the protective placement order, which was around the time that K.K.'s protective placement order would have been subject to the legally required annual review. *See **State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.***, 122 Wis. 2d 65, 84-85, 362 N.W.2d 104 (1985) (requiring an annual review of the necessity of a protective placement and, if necessary, a "full due process hearing" on the need for continued protective placement). Neither party, after being notified that this appeal was submitted to this court, informed this court that this appeal may be moot or otherwise affected by any such annual review. Accordingly, we address the appeal as submitted.

Separately, when the circuit court issued the protective placement order, K.K. was also subject to a WIS. STAT. ch. 51 commitment order. The parties do not in their appellate briefing address any potential effect of the commitment order on this appeal. Accordingly, we do not address the commitment order further.

678 N.W.2d 285. "The circuit court's factual findings will not be overturned unless clearly erroneous." **Coston v. Joseph P.**, 222 Wis. 2d 1, 22, 586 N.W.2d 52 (Ct. App. 1998); *see* WIS. STAT. § 805.17(2). The issue of whether the evidence satisfies the legal standard for protective placement is a question of law that we review de novo. **Coston**, 222 Wis. 2d at 23.

¶6     "'Protective placement' means a placement that is made to provide for the care and custody of an individual." WIS. STAT. § 55.01(6). Before a circuit court can order the protective placement of an individual, the court must find by clear and convincing evidence that the individual meets all four standards in WIS. STAT. § 55.08(1). WIS. STAT. § 55.10(4)(d). Those standards are as follows, with the focus here being on (c):

> (a) The individual has a primary need for residential care and custody.
>
> (b) The individual is a minor who is not alleged to have a developmental disability and on whose behalf a petition for guardianship has been submitted, or is an adult who has been determined to be incompetent by a circuit court.
>
> (c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others. Serious harm may be evidenced by overt acts or acts of omission.
>
> (d) The individual has a disability that is permanent or likely to be permanent.

Sec. 55.08(1).

¶7     Here, as noted, the dispositive issue on appeal is whether the County proved the third standard, WIS. STAT. § 55.08(1)(c), by clear and convincing

evidence. Specifically, K.K. argues that the County failed to present sufficient evidence to show that his mental illness resulted in his being "so totally incapable of providing for his … own care or custody as to create a substantial risk of serious harm to himself … or others." *See* § 55.08(1)(c). Under this standard, "[t]he risk of harm must be substantial. Mere speculation as to difficulties [that an individual] may encounter is not sufficient. Specific harm must be foreseeable to fulfill this requirement." *Zander v. County of Eau Claire*, 87 Wis. 2d 503, 514-15, 275 N.W.2d 143 (Ct. App. 1979). "The harm envisioned … must be directly foreseeable from the overt acts or omissions of the individual." *K.N.K. v. Buhler*, 139 Wis. 2d 190, 202, 407 N.W.2d 281 (Ct. App. 1987).

*Additional Background*

¶8　　We present here pertinent parts of the testimony offered at the hearing, the GAL's recommendation, and the circuit court's decision.

¶9　　Care Center director Tim Blumentritt testified that K.K. "struggle[d] to regulate his emotions and behaviors at times." Blumentritt testified more specifically that K.K. had "periods of instability, irritability" and described as examples that K.K. recently displayed a fist toward a staff member and slammed a door when he could not find his coffee cup. Blumentritt testified that K.K. was physically capable of handling his activities of daily living, but that he had to be reminded of certain tasks such as changing clothes and showering. Blumentritt opined that, if K.K. were not in a structured environment with constant supervision, "he would struggle significantly." Blumentritt testified more specifically that, without K.K.'s current supports at the Care Center and through the County, "getting to appointments, staying organized, [and] taking medications would be significant challenges." Blumentritt testified that K.K. had shown some

improvement over the previous two months, and Blumentritt attributed that improvement to the stability and structure provided by the Care Center.

¶10    County social worker Stephanie Varilek testified that she had been working on connecting K.K. with resources such as mental health services and housing.  Varilek testified that these efforts were hindered by K.K.'s lack of insight into his levels of need, his difficulties in following through on referrals (such as when he hung up on an agency employee based on how the employee sounded), and his inability to independently complete paperwork for certain benefits.  Varilek testified that she was also helping K.K. obtain a state ID, which was hindered by K.K.'s inability to provide the necessary documents.  Varilek testified that, if K.K. were no longer in a structured environment with constant supervision, K.K. would struggle with managing and maintaining appointments, managing his medication, and maintaining access to resources and services.

¶11    County psychologist Rooney testified that he based his report on his review of K.K.'s medical records, conversations with Care Center staff, and a personal evaluation of K.K.  Rooney testified that K.K. had a serious and persistent mental illness, that his condition was permanent or likely to be permanent, and that his condition was treatable.  Rooney opined that K.K.'s condition "ma[d]e him unable to effectively receive and evaluate information and [to] make or communicate decisions related to his physical health and safety."  Rooney testified that K.K. "appeared to lack insight into his condition, into his own behavior."

¶12    Rooney opined that K.K. was "so totally incapable of providing for his own care and custody that he[] [was] a substantial risk of harm to himself or others" and that "if left to his own devices, he would be homeless and wouldn't be

able to maintain stable placement." Rooney testified that K.K. could, with help, follow through with activities of daily living and taking his medications, but that he could not "organize these tasks and follow through and do those things on his own."

¶13 Rooney testified that an adult family home or group home would be the least restrictive appropriate environment for K.K. and that it needed to be "a specialized one with people that are trained to … ensure he's taking his medications as prescribed, that his physical whereabouts are being monitored, and that there's not an opportunity for him to leave, and that staff are also sensitive with how they go about encouraging him to follow through with his activities of daily living."

¶14 On cross-examination, Rooney agreed with the proposition that K.K. was "pretty good at taking care of his" activities of daily living, and testified that "some prompting and encouragement and sending him in the right direction and saying it the right way [was] something that was helpful for him while at the Care Center to follow through with his" activities of daily living. Rooney also agreed that K.K. was good about requesting his medications as needed.

¶15 The GAL recommended that the circuit court order protective placement. The GAL noted that K.K. "does very well once he's stabilized and he's taking his medication. However, once he doesn't have the 24/7 supervision, he decompensates, and then things become a problem for him." The GAL opined that protective placement would "give a longer period of time for stabilization" and that, if K.K. made progress, "the Court [could] always change the conditions of the protective placement" at the annual reviews.

¶16    The circuit court found that K.K. was "suffering a condition that render[ed] him incompetent, … in particular, a serious and persistent mental illness, … that this [was] permanent or likely to be permanent, and as a result, there[] [was] a primary … residential need for care and custody, [and] that the least restrictive environment consistent with his needs [was] a facility that [would] provide 24/7 care, in this case, what would be appropriate appears to be an adult family home or a community-based residential facility."  The court determined that protective placement was appropriate and that protective services would not meet K.K.'s needs "at this time."  The court stated that it "ha[d] too many concerns about either acts of omission or things where [K.K.] would not be able to care for himself."

*Analysis*

¶17    The testimony at the hearing established that K.K. was capable of doing things for himself, taking care of his daily activities, and requesting his medications, but that K.K. might need help in doing some of those tasks.  As to the kind of help that might be needed, the witnesses identified the following concerns: completing paperwork; following through on referrals and managing appointments so as to maintain access to resources and services such as mental health supports and housing; staying organized; and managing medications.  As to all of these concerns, the witnesses testified that K.K. could maintain access to resources and services, obtain housing, organize and follow through on activities of daily living, and manage medications, but that he would need help with some of those tasks.

¶18    None of the witnesses testified as to why protective placement was necessary for K.K. to receive such help, or how, even without such help, K.K. would be at substantial risk of serious harm.  In addition, none of the witnesses

8

testified as to what specific symptoms would return if K.K. stopped taking medications, what activities of daily living he would be unable to perform, or how those symptoms or inabilities would prevent him from caring for himself so as to present a substantial risk of serious harm.

¶19    Rooney did testify that K.K. would become homeless "if left to his own devices," but did not explain what serious harm would ensue. As the County concedes, "being homeless is not inherently dangerous enough to meet the protective placement standards." While the County argues that K.K. did not possess the abilities to follow through with the services necessary to ensure that his needs were met even while homeless, the record does not contain evidence of the foreseeable harm that might result. *See* ***K.N.K.***, 139 Wis. 2d at 203 (identifying past history of specific harmful acts as reliably predicting "the foreseeable harm which may result" without protective placement). Unlike in ***K.N.K.***, none of the witnesses testified to how K.K. had so failed to follow through that he posed a danger to himself or others in the past, and their testimony as summarized above did not provide specific examples of ways in which he would be unable to follow through so as to pose a substantial risk of danger to himself in the future if he were not protectively placed.

¶20    It is true that the GAL suggested that, without the "the 24/7 supervision" that the GAL implied ensures K.K.'s regular medication, "he decompensates, and then things become a problem for him." As with other testimony that the County now relies on, these concepts could have provided reasonable starting points for the County's position regarding the substantial risk of serious danger to himself or others. But the GAL's testimony lacked the necessary detail to meet the standard. The GAL provided no specifics about what she meant by decompensation or by "a problem for him."

¶21    The County relies on Rooney's report, in particular to its statements of fact related to K.K.'s history and past behavior.  The circuit court admitted the report into evidence at the hearing but did not rely on it in making its ruling, nor did Rooney testify to the facts referred to by the County.  K.K. argues that Rooney, in forming his opinion, may properly have relied on the facts stated in his report, but Rooney did not testify, and his report did not show, that he had first-hand knowledge of those facts.  Therefore, K.K. argues, those statements of fact are hearsay and cannot be considered for the truth of the matter asserted.  We need not resolve this dispute because, as we now explain, our conclusion that the County failed to meet its burden remains unchanged even considering those statements.

¶22    In the report, Rooney stated that, when K.K. was last living in the community, he stopped taking his medications, used illicit substances, and was evicted from the place where he was living.  Rooney also reported that, while at the Care Center, K.K. was "disorganized in his behavior and overall functioning" as shown when he emptied all of the sugar bags and by his drinking too much coffee, and that he needed to be prompted to shower and to place his dirty clothes "in a certain location so that laundry can be done."  Based on this history, combined with K.K.'s continuing lack of insight into the nature of his mental health condition and its impact on his functioning and judgment, Rooney opined that K.K. had a high risk of taking illicit substances and needing to be stabilized.

¶23    However, these aspects of Rooney's report do not allow the County to meet its burden of proving by clear and convincing evidence that K.K. was at risk of serious harm to himself or others.  Even in his report, Rooney did not describe what specific symptoms or behaviors occurred or would recur if K.K. took "illicit substances," or why he needed or would need "to be stabilized."

10

Rooney in his testimony did reference K.K.'s having not used illicit substances since he had been committed in the ninety days before the hearing, but neither Rooney nor the other witnesses presented evidence showing the harm that did or would result if K.K. used illicit substances.

¶24 In sum, even when statements in Rooney's report are taken into account, the County did not show, by clear and convincing evidence, that K.K. would, if not protectively placed, be so unable to care for himself as to create a substantial risk of serious danger to himself or others.

## CONCLUSION

¶25 For the reasons stated, we affirm the order for K.K.'s guardianship of his person and reverse the order for his protective placement.

*By the Court.*—Order affirmed; order reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.