COURT OF APPEALS
DECISION
DATED AND FILED

August 21, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP220**

Cir. Ct. No. **2012GN39**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT IV**

---

IN THE MATTER OF THE PROTECTIVE PLACEMENT OF J.A.B.:
WOOD COUNTY,

    PETITIONER-RESPONDENT,

V.

J.A.B.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Wood County: NICHOLAS J. BRAZEAU, JR., Judge. *Reversed*.

¶1 KLOPPENBURG, P.J.[1] J.A.B. appeals an order for her protective placement pursuant to WIS. STAT. ch. 55. J.A.B. argues that Wood County failed

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

to prove, by clear and convincing evidence, one of the four standards that must be met to order protective placement: that she was so totally incapable of providing for her own care or custody as to create a substantial risk of serious harm to herself or others, as required by WIS. STAT. § 55.08(1)(c). I agree. Accordingly, I reverse the order for protective placement.[2]

## BACKGROUND

¶2      In March 2024, the County filed a petition for protective placement of J.A.B.[3]  This petition followed the termination, in 2022, of J.A.B.'s earlier protective placement, which was first ordered in 2012. The County subsequently filed a psychologist's report prepared by Dr. Nicholas Starr, who evaluated J.A.B. over the telephone in April 2024. In response to the County's filings, J.A.B. sought an independent psychological evaluation from Dr. Steven Benson. Benson evaluated J.A.B. in person in May 2024 and filed a psychologist's report with the circuit court.

¶3      The circuit court held a hearing on the petition in June 2024. The parties stipulated to the admission of both psychologists' reports and waived their right to cross-examine the psychologists. The parties also stipulated to two of the four standards that must be met to order protective placement: "the guardianship

---

[2] J.A.B. also argues that the County failed to prove, by clear and convincing evidence, another of the four standards that must be met to order protective placement: that she had a primary need for residential care and custody, as required by WIS. STAT. § 55.08(1)(a). I do not address this argument because of my dispositive conclusion that the County failed to prove, by clear and convincing evidence, that she was so totally incapable of providing for her own care or custody as to create a substantial risk of serious harm to herself or others, as required by § 55.08(1)(c).

[3] The parties stipulated to the continuation of the guardianship of person and estate.

requirement," apparently referring to WIS. STAT. § 55.08(1)(b), and that J.A.B. had a disability that is permanent or likely to be permanent, as required by § 55.08(1)(d).[4]  As to the two remaining standards that must be met to order protective placement, § 55.08(1)(a) and (c), the court heard testimony from an emergency mental health adult protective service coordinator for Wood County Human Services and admitted Starr's and Benson's reports into evidence.  I present in the discussion below pertinent parts of the witness's testimony and the psychologists' reports.  After considering the parties' arguments and the recommendation of the guardian ad litem (GAL), the court granted the petition for protective placement of J.A.B.

---

[4]  WISCONSIN STAT. § 55.08(1)(b) requires that, to order a protective placement, a circuit court find by clear and convincing evidence that "[t]he individual is a minor who is not alleged to have a developmental disability and on whose behalf a petition for guardianship has been submitted, or is an adult who has been determined to be incompetent by a circuit court."  In the circuit court, both J.A.B. and the County stipulated that J.A.B. met "the guardianship requirement," and, on appeal, the County goes further and asserts that J.A.B. "was under a guardianship of her person and estate."  However, guardianship of an adult is not a requirement for protective placement; a court must instead find that the adult "has been determined to be incompetent by a circuit court."  *See* § 55.08(1)(b).  J.A.B. does not argue that she did not meet the applicable standard in § 55.08(1)(b)—that she "has been determined to be incompetent by a circuit court"—and, accordingly, I do not address the County's assertion regarding guardianship any further.

3

¶4    J.A.B. appeals.[5]

## DISCUSSION

¶5    This court's review of a protective placement order presents a mixed question of law and fact. *Walworth County v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377. "The circuit court's factual findings will not be overturned unless clearly erroneous." *Coston v. Joseph P.*, 222 Wis. 2d 1, 22, 586 N.W.2d 52 (Ct. App. 1998) (citing WIS. STAT. § 805.17(2)). The issue of whether the evidence satisfies the legal standard for protective placement is a question of law that the appellate court reviews de novo. *Id.* at 23.

¶6    "'Protective placement' means a placement that is made to provide for the care and custody of an individual." WIS. STAT. § 55.01(6). A circuit court may order the protective placement of an individual if the court finds, by clear and convincing evidence, that the individual meets all four standards set forth in WIS. STAT. § 55.08(1):

> (a) The individual has a primary need for residential care and custody.

---

[5] Given the passage of time that is significant for the nature of the case, I now briefly explain the timeline since the circuit court issued the protective placement order on June 25, 2024. J.A.B. timely filed a notice of intent to pursue postdisposition relief from that order and, after receiving an extension of time in which to file a motion or a notice of appeal, filed the notice of appeal in January 2025. After the parties completed their appellate briefing, the appeal was submitted to this court in June 2025, approximately one year after entry of the protective placement order, which was around the time that J.A.B.'s protective placement order would have been subject to the legally required annual review. *See State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.*, 122 Wis. 2d 65, 84-85, 362 N.W.2d 104 (1985) (requiring an annual review of the necessity of a protective placement and, if necessary, a "full due process hearing" on the need for continued protective placement). Neither party, after being notified that this appeal was submitted to this court, informed this court that this appeal may be moot or otherwise affected by any such annual review. Accordingly, I address the appeal as submitted.

4

(b) The individual … is an adult who has been determined to be incompetent by a circuit court.

(c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others. Serious harm may be evidenced by overt acts or acts of omission.

(d) The individual has a disability that is permanent or likely to be permanent.

§ 55.08(1); WIS. STAT. § 55.10(4)(d) (setting standard of proof).

¶7  As stated, the dispositive issue on appeal is whether the County proved, by clear and convincing evidence, that as a result of her disability, J.A.B. was so totally incapable of providing for her own care or custody that she posed a substantial risk of serious harm to herself or others, as required by WIS. STAT. § 55.08(1)(c). Under this standard, "[t]he risk of harm must be substantial. Mere speculation as to difficulties [that an individual] may encounter is not sufficient. Specific harm must be foreseeable to fulfill this requirement." ***Zander v. County of Eau Claire***, 87 Wis. 2d 503, 514-15, 275 N.W.2d 143 (Ct. App. 1979). "The harm envisioned … must be directly foreseeable from the overt acts or omissions of the individual." ***K.N.K. v. Buhler***, 139 Wis. 2d 190, 202, 407 N.W.2d 281 (Ct. App. 1987). Moreover, "the foreseeable harm must be serious.… [M]inor accidents, injuries and illness are not sufficient to satisfy this requirement." ***Zander***, 87 Wis. 2d at 515.

*Additional Background*

¶8  I present here pertinent parts of the testimony offered at the hearing, the psychologists' reports, the GAL's recommendation, and the circuit court's decision and reasoning.

¶9      At the hearing in June 2024, the County's sole witness was Erin Knetter, an emergency mental health adult protective service coordinator for Wood County Human Services.   Knetter testified as follows.   Knetter had "provid[ed] social work-type services to [J.A.B.]" during J.A.B.'s previous protective placement and had filed the petition for the reinstatement of J.A.B.'s protective placement at issue in this case.  Knetter had not worked with J.A.B. for the two years immediately preceding the hearing.  During those two years, "[a]ccording to [J.A.B.'s] guardian, [J.A.B.] continue[d] to drink alcohol."  On one occasion, J.A.B. became "highly intoxicated" at her neighbor's residence and "contacted the maintenance man to help her use a walker to get back to her apartment because she was so incapable of walking."

¶10     J.A.B. "continue[d] to have contact with law enforcement in regards to alcohol use as well as her inability to prevent herself from abuse from others." Within the last year, law enforcement transported J.A.B. to a medical center "to determine if she needed a [WIS. STAT. §] 51.45," because "law enforcement felt that she was so unsafe."[6]  On this occasion, "[o]nce she was able to sober up, she was able to be sent home to care for herself."  J.A.B. "ha[d] two neighbors that f[ou]ght with her," and she "ha[d] been observed to have multiple lacerations[ and] bruising," but she was not able "to identify if someone had hurt her or to prevent it from happening again."

¶11     In the two years since the termination of J.A.B.'s protective placement, J.A.B. was evicted from two separate residences due to her alcohol use

---

[6] Under WIS. STAT. § 51.45, an intoxicated person who meets certain standards may apply for voluntary treatment for alcoholism, be committed for emergency treatment, or be involuntarily committed for treatment. *See* § 51.45(10)-(13).

"and bed bugs," most recently in August 2023. J.A.B. had not received a notice of eviction from her current apartment, but she had received a "notice of … infractions that can lead to … eviction" from her current apartment, sometime in February or March 2024.

¶12 Knetter opined that J.A.B. required in-home services but that protective services were insufficient because J.A.B. "tend[ed] to not allow people into her home" and had a history of becoming "belligerent" with service providers due to her alcohol use. Knetter further testified: "[J.A.B.] ha[d] no ability to do anything independent, to clean her home or to stop her alcohol use, so she gets evicted," and "if [J.A.B. were] evicted, we [would] have no place to put her because of how many evictions she ha[d] on her record." Knetter opined that an adult family home would be the least restrictive placement for J.A.B. that would ensure her needs were met.

¶13 On cross-examination, Knetter testified as follows. Knetter had not visited J.A.B. at her current residence and was unaware of the present condition of J.A.B.'s apartment. In addition, J.A.B. was actively receiving services from Lutheran Social Services and, to Knetter's knowledge, was attending all appointments and accepting all in-home services.

¶14 Following Knetter's testimony, the circuit court considered the psychologist reports completed by Starr and Benson. Starr based his report on his review of treatment records and prior reports, discussions with J.A.B.'s case worker, and a ten-minute telephone conversation with J.A.B.[7] Starr's report

---

[7] During Starr's short call with J.A.B., she refused to participate in a psychiatric evaluation. Starr reported that J.A.B. sounded intoxicated during the call.

contained the following information. J.A.B. had a significant history of alcohol abuse and schizoaffective disorder "such that she [was] not able to properly care for herself." J.A.B. "ha[d] been unable to maintain a safe living environment in her home and [was] facing her third eviction since 2022." J.A.B. "continue[d] to struggle with basic functioning to include eating, sleep and hygiene" and "has had numerous law enforcement contacts for noise complaints and physical altercations with her neighbors." J.A.B. did not refuse or resist her prescribed treatment and medications.

¶15 Starr opined that J.A.B. required protective placement, explaining that J.A.B. "[was] at significant risk and [was] vulnerable." Starr opined that a less restrictive measure was not appropriate for J.A.B. because "[J.A.B. was] uncooperative and ha[d] [a] history of non-compliance," and "ha[d] been unable to remain safe and sober outside of a facility."

¶16 Benson based his report on an in-person diagnostic clinical interview and neuropsychological testing of J.A.B. as well as a review of J.A.B.'s treatment records since she was first found in need of protective placement in 2012. Benson diagnosed J.A.B. as suffering from, among other incapacities, serious mental disorders and neurocognitive deficits due to multiple etiologies, including chronic alcohol abuse. Benson's report also contained the following information. "[J.A.B.] reportedly ha[d] been abstinent from alcohol since March 30, 2024" but had a history of "periodic relapses with respect to alcohol abuse." J.A.B. "dress[ed] herself without help; perform[ed] toileting tasks without assistance; use[d] a cell phone for dialing a few well-known numbers; prepare[d] her own meals; and adequate[ly] complet[ed] … laundry." J.A.B. performed some housekeeping tasks but relied on Lutheran Social Services for assistance with housekeeping and shopping. J.A.B. was compliant with prescribed medications,

but she had previously been noncompliant with recommendations for psychotherapy and AODA (Alcohol and Other Drug Abuse) treatment. Benson reported that J.A.B. had "impaired social judgment, extremely limited insight, and significant deficits of executive functions," and that she "should be considered a vulnerable adult, who is at risk for manipulation and exploitation by others" as well as for "physical harm and resumption of alcohol abuse." Benson opined that these risks warranted the need for guardianship for J.A.B. but not for protective placement.

¶17 Benson opined that J.A.B. did not require protective placement because she "ha[d] demonstrated the ability to live independently with the support of her current guardian and occasional assistance from Lutheran Social Services." Benson recommended referring J.A.B. to the Community Comprehensive Services (CCS) program at Wood County Human Services so that she could receive further assistance in managing her daily activities and in monitoring her alcohol abuse. Benson also recommended AODA treatment.

¶18 The GAL agreed with the County's recommendation for protective placement and opined that, without protective placement, J.A.B. "[was] not going to address her alcohol needs, and … she need[ed] to address those before the damage becomes more permanent."

¶19 The circuit court stated that Benson's report was "not internally consistent" and concluded that J.A.B. met the criteria for protective placement "based on serious and persistent mental illness and other like [in]capacities, including her alcohol use, which [was] a huge problem for her, and w[ould] … become [a] permanent, probably vegetative disability in her long term if that's not addressed." The court determined that the least restrictive placement consistent

9

with J.A.B.'s needs was an unlocked adult family home. The court concluded: "[J.A.B.] continue[d] to drink. She continue[d] to fight with neighbors. She need[ed] help getting around her apartment. She [did not] allow people in the apartment. There are a lot of reasons I think this is appropriate for her."

*Analysis*

¶20 The evidence presented at the hearing is insufficient to show that J.A.B., because of her disability, was "so totally incapable of providing for … her own care or custody as to create a substantial risk of serious harm to … herself or others," as required by WIS. STAT. § 55.08(1)(c). As stated, this standard requires that the County identify a specific, foreseeable, and serious harm, and that the County show that the risk of harm was substantial. *Zander*, 87 Wis. 2d at 514-15. The circuit court, implicitly crediting Starr's report and Knetter's testimony, found that J.A.B. had a history of refusing to allow people into her apartment, fought with her neighbors, needed help getting around her apartment, and continued to abuse alcohol. In addition, the court found that J.A.B.'s "alcohol use … [was] a huge problem for her, and w[ould] … become [a] permanent, probably vegetative disability in her long term if that's not addressed." As a matter of law, these factual findings are not sufficient to show that J.A.B. was unable to care for herself so as to create a substantial risk of serious harm to herself or others because, as I now explain, they do not identify a specific, foreseeable, and serious harm and show that the risk of harm was substantial.

¶21 *Refusing to allow people into apartment.* In his report, Starr stated that J.A.B. "[was] uncooperative and [had a] history of noncompliance," and Knetter testified that, despite J.A.B.'s history of not allowing people into her home and being "belligerent" with service providers, J.A.B. was currently accepting in-

home services as well as attending all of her appointments. Assuming that the circuit court gave more weight to Starr's report than to Knetter's testimony, and accepting this finding regarding J.A.B.'s unwillingness to accept in-home services as not clearly erroneous, it is not sufficient to establish a substantial risk of serious harm. Specifically, Starr did not report, and Knetter did not testify, as to what specific harm would result from J.A.B.'s refusal to allow people into her home.

¶22 *Fighting with neighbors.* Starr's report also stated that J.A.B. "has had numerous law enforcement contacts for noise complaints and physical altercations with her neighbors." Knetter testified to the appearance of bruises and lacerations on J.A.B. that J.A.B. could not explain. But again, neither Starr nor Knetter explained how J.A.B.'s fights with her neighbors put her or others at a substantial risk of serious harm. "[M]inor accidents, injuries and illness are not sufficient to satisfy" the standard set forth in WIS. STAT. § 55.08(1)(c), and there is no evidence in the record showing that any bruising or lacerations were more than minor. *See Zander*, 87 Wis. 2d at 515.

¶23 *Needing help getting around apartment.* The circuit court's finding that J.A.B. "need[ed] help getting around her apartment" is supported by Knetter's testimony that J.A.B. "ha[d] no ability to do anything independent, to clean her home" or to move apartments without help from her guardian, and Benson's statement in his report that "while [J.A.B.] perform[ed] some housekeeping tasks, she relie[d] upon assistance from Lutheran Social Services." However, Knetter and Benson did not explain how requiring assistance to clean one's apartment and complete housekeeping tasks, or requiring assistance to move homes, led to a substantial risk of serious harm. Starr reported that J.A.B. "ha[d] been unable to maintain a safe living environment in her home" and "[was] at significant risk and [was] vulnerable," but these statements lack the necessary detail to meet the

protective placement standard set forth in WIS. STAT. § 55.08(1)(c), *i.e.*, specific "overt acts or acts of omission" that J.A.B. had engaged in that created a substantial risk of serious harm. *See* WIS. STAT. § 55.08(1)(c); **K.N.K.**, 139 Wis. 2d at 202 ("The harm envisioned … must be directly foreseeable from the overt acts or omissions of the individual."). Starr's vague assertions allow for speculation regarding the risk of harm that would result without J.A.B.'s protective placement, but "[m]ere speculation as to difficulties [J.A.B.] may encounter is not sufficient." *See **Zander***, 87 Wis. 2d at 515.

¶24 *Continuing to drink alcohol.* Much of the evidence speaks to J.A.B.'s problems with alcohol. Indeed, J.A.B.'s alcohol abuse appeared to be the primary concern of Knetter and the GAL as well as the motivating factor for the circuit court's decision. The court's finding that J.A.B.'s alcohol use would lead to a "permanent, probable vegetative disability in her long term" is speculative and not supported by the evidence. The record contains no evidence of specific, foreseeable harm that would result from J.A.B.'s abuse of alcohol. *Contra **Wood County v. P.J.L.***, No. 2024AP2098-FT, unpublished slip op., ¶29 (WI App Jan. 9, 2025) (finding substantial risk of serious harm where consumption of alcohol along with medications "could be lethal"); ***Waukesha Cnty. DHHS v. Stanley W.F.***, No. 2009AP985-FT, unpublished slip op., ¶11 (WI App Sept. 9, 2009) (finding substantial risk of serious harm where "[t]he predicted consequences associated with alcohol use … include[d] a probability of death or a comatose state").[8] Knetter testified that on one occasion law enforcement transported J.A.B. to a medical center because "[they] felt that she was so unsafe," but confirmed that

---

[8] *See* WIS. STAT. RULE 809.23(3)(b) (permitting the citation of authored unpublished opinions issued after July 1, 2009, for their persuasive value).

12

J.A.B. "was able to be sent home to care for herself" once she regained sobriety. Knetter also testified that J.A.B. was able to seek help when she was too intoxicated to independently travel to her apartment. The GAL opined that J.A.B. needed to address her problem with alcohol before it caused permanent damage, but neither he nor Knetter explained what specific, foreseeable harm would result from J.A.B.'s alcohol abuse. Nor did Starr's report describe what specific symptoms or behaviors occurred or would recur if J.A.B. continued to drink alcohol.

¶25 *Additional information.* Although not specifically credited by the circuit court, I briefly address the following evidence presented at the hearing and explain why it is not sufficient to meet the substantial risk of serious harm standard set forth in WIS. STAT. § 55.08(1)(c). First, Starr's report supported Knetter's testimony that J.A.B. was at risk of being evicted from her current residence. However, neither Starr nor Knetter discussed what specific, foreseeable, and serious harm would result from another eviction, with Knetter testifying only that a third eviction would make it harder for J.A.B. to obtain housing. Difficulty obtaining housing is not a substantial harm sufficient to meet the standard in § 55.08(1)(c). Second, Starr reported that J.A.B. "continue[d] to struggle with basic functioning to include eating, sleep and hygiene." Again, these vague assertions do not evidence a substantial risk of serious harm to J.A.B. or others. Third, Benson reported that J.A.B. had "impaired social judgment, extremely limited insight, and significant deficits of executive functions," and opined that guardianship was warranted because J.A.B. was "a vulnerable adult, who is at risk for manipulation and exploitation by others." These reports are concerning, but they are vague and do not describe "overt acts or acts of omission" that "create[d] a substantial risk of serious harm" to J.A.B. or others so as to

support protective placement. *See* § 55.08(1)(c); ***Zander***, 87 Wis. 2d at 515 ("Specific harm must be foreseeable to fulfill this requirement."); ***Wood County v. Zebulon K.***, Nos. 2011AP2387, 2011AP2394, unpublished slip op., ¶¶15-16 (WI App Feb. 7, 2013) (concluding evidence that individuals were "unable to prevent financial exploitation" and were "easy to manipulate" failed to meet the standard for a substantial risk of serious harm).

¶26 The County argues that J.A.B. "is essentially asking [this court] to reweigh the evidence as if the [c]ourt of [a]ppeals were the [c]ircuit [c]ourt." This argument misses the mark. As explained above, I independently conclude that the evidence credited by the court, considered as a whole, was not sufficient to satisfy the standard for protective placement set forth in WIS. STAT. § 55.08(1)(c). That is the duty of this court. *See **Coston***, 222 Wis. 2d at 23 (appellate court reviews de novo whether the evidence supports protective placement).

¶27 In sum, the County did not show, by clear and convincing evidence, that J.A.B. would, if not protectively placed, be so unable to care for herself as to create a substantial risk of serious harm to herself or others.

## CONCLUSION

¶28 For the reasons stated, I reverse the order for J.A.B.'s protective placement.

*By the Court.*—Order reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.