COURT OF APPEALS
DECISION
DATED AND FILED

October 29, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1044**

STATE OF WISCONSIN

Cir. Ct. No. 2023GN66

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE GUARDIANSHIP AND PROTECTIVE PLACEMENT OF J.D.A.;

OZAUKEE COUNTY,

    PETITIONER-RESPONDENT,

  V.

J.D.A.,

    RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Ozaukee County: SANDY A. WILLIAMS, Judge. *Dismissed in part; affirmed in part*.

Before Neubauer, P.J., Gundrum, and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Jackie[1] appeals from three orders entered in January 2024 that: (1) placed her under protective placement; (2) allowed her to be involuntarily medicated; and (3) established a guardianship over her person and estate. She also challenges the circuit court's decision denying her request for an evidentiary hearing on her postdisposition motion. Jackie raises a host of arguments that, she contends, requires reversal of these orders. She argues that there was insufficient evidence to support the guardianship, involuntary medication, and protective placement orders. She also contends that the court failed to make sufficient findings to support these orders. In addition, Jackie challenges the constitutionality of WIS. STAT. § 55.14(3)(e)1. (2023-24)[2] on the ground that it allows for involuntary medication without a finding that an individual is presently dangerous. Finally, she argues that she was entitled to a hearing on her postdisposition motion because it contained sufficient material to establish that her counsel was ineffective in failing to make timely hearsay objections during the combined hearing on those orders.

¶2    After briefing in this appeal was completed, we asked the parties to address an additional issue: whether the requirement that protective placement and involuntary medication orders be reviewed annually renders Jackie's appeal of those orders moot. *See* WIS. STAT. §§ 55.18, 55.19. We need not resolve that issue here, however. The parties agree that Jackie's appeal of the involuntary medication order is moot because that order was discontinued in January 2025. Because Jackie is no longer subject to that order, we dismiss her appeal as to that

---

[1] Jackie is a pseudonym.

[2] All references to the Wisconsin Statutes are to the 2023-24 version.

order. With respect to the protective placement order, the parties agree that even if Jackie's appeal of that order is moot, it falls within exceptions to our mootness doctrine. Thus, we will address her substantive challenges to that order.

¶3      As to the guardianship and protective placement orders, we conclude that the circuit court made the required findings to support an order for guardianship of Jackie's person and estate, and for protective placement of Jackie, and that those findings were supported by sufficient evidence. We also conclude that the court did not err when it denied Jackie's postdisposition motion without a hearing.

## BACKGROUND

¶4      Jackie was involuntarily committed under WIS. STAT. ch. 51 from 2008 until early 2022, when her commitment was discontinued following this court's reversal of her then-in-effect commitment and involuntary medication orders. *See Ozaukee County v. J.D.A.*, No. 2021AP1148, unpublished slip op. (WI App Dec. 15, 2021). Jackie did not voluntarily continue mental health treatment after she was released and decompensated significantly. She was committed involuntarily again in July 2023 and placed under a new involuntary medication order.

¶5      In November 2023, Ozaukee County filed petitions seeking: (1) the appointment of a permanent guardian over Jackie's person and estate; (2) protective placement for Jackie; and (3) involuntary medication. Jeffrey Marcus, a licensed physician and psychiatrist, examined Jackie and authored a report and a statement concerning her medications, which were filed with the petitions. The County also filed a comprehensive report concerning Jackie that was prepared by Kathleen McCormick of the Ozaukee County Department of

Human Services. In addition, the circuit court appointed an attorney, Courtney Meyer, as guardian ad litem for Jackie; Meyer spoke with Jackie and prepared a report recommending that the County's petitions for guardianship and protective placement be granted.

¶6 On January 10, 2024, the circuit court held a hearing on the petitions at which Marcus, McCormick, several of Jackie's treatment providers, and her former landlord testified. Marcus testified that he met with Jackie face-to-face for an interview and reviewed treatment records from the Trempealeau County Healthcare Center, the Ozaukee County Department of Human Services, reports of examinations from prior WIS. STAT. ch. 51 proceedings, and a statement from Jackie's son. Marcus testified that Jackie has a "major mental illness." When asked whether Jackie was able "to receive and evaluate information and make decisions … to provide for her own essential care and safety[,]" Marcus responded that Jackie was unable to do so "primarily due to her persistent mental health symptoms."

¶7 Marcus explained that Jackie has "persistent psychosis[,] … does not believe she has a mental illness, believes she had been healed by God," and that these beliefs "[have] affected her ability to use sound judgment and do things that are necessary for her … health and safety; so it's affected her decisionmaking in many areas." Marcus testified that Jackie's mental illness impairs her functioning in the areas of "reasoning, executive functioning, and … her mental health and behavioral symptoms." As to her ability to reason, Marcus relied on Jackie's statements during his examination which, in his view, demonstrated a lack of "understanding of safety issues [and] of safety awareness." As to executive functioning, Marcus explained that Jackie lacks insight into her mental health condition and need for treatment. As a result, her judgment is "fairly impaired,"

which led her to stop taking medication when she was released from commitment in 2022, and to her subsequent decompensation.

¶8      When asked whether Jackie was "able to receive and evaluate information and make decisions" regarding financial matters, Marcus responded that he did not "believe she's able to do those things" because of the impairments to executive functioning and her ability to reason.  He explained that the treatment Jackie has received "has lessened her sy[mptoms], but has not restored [her] capacity in various areas" and that although her symptoms are treatable, her condition is not curable.  He agreed that Jackie "would be at substantial risk of harm to herself or others" absent protective placement, explaining that she "would have increasing difficulty taking care of herself, maintaining treatment, being able to care for her basic needs in her apartment and engaging in safe behavior."  As support for this opinion, Marcus pointed to the following incidents that were documented in Jackie's records: (1) "going out … improperly clothed for the weather"; (2) "attempt[ing] to light a stove with a lit paper towel[,] creating an unsafe situation"; and (3) an incident in which she ran into the middle of a busy road.  As a result, Marcus believed Jackie was "in need of residential care and custody[.]"

¶9      Marcus testified further that Jackie was prescribed medications to alleviate her psychotic symptoms, including "hallucinations and delusions and mood instability[.]"  He confirmed that these medications improved her symptoms during her most recent commitment.  However, based on "[h]er history and the natural course of the illness that she has[,]" Marcus believed "there's a very high likelihood" she would decompensate again and become dangerous to herself if she stopped taking them.  More specifically, and consistent with his medication report, Marcus testified that without medication, Jackie would become dangerous under

the third standard under WIS. STAT. § 51.20(1)(a)2.c. because she would exhibit "grossly impaired judgment," and under the fourth standard under § 51.20(1)(a)2.d. because she would be unable to meet her basic needs for daily living. Marcus's report and medication statement were admitted into evidence without objection.

¶10 Marcus's report contains additional information regarding Jackie's mental health impairment and its impact on her ability to function independently. The report documents information provided by one of her sons concerning her status following her release from commitment in early 2022. According to the report, her son relayed that her "mental status had significantly declined since at l[e]ast January 2023[,]" that "[s]he continued to live in her apartment in Cedarburg while receiving financial assistance from her mother[,]" and that she experienced "increasing difficulty making decisions and was engaging in erratic and grossly unsafe behaviors" and "had become increasingly delusional and was experiencing auditory hallucinations."

¶11 Consistent with his testimony, Marcus's report notes that Jackie's "insight into the presence and nature of her mental illness appears poor." He identified her impairment with respect to reasoning as "[m]oderate to severe[,]" citing her "dismissive" attitude towards "safety concerns" and her repeated claims that God had healed her and that she did not require medication or assistance with daily living. The report also identified moderate or severe impairments in executive functioning behaviors—use of insight, judgment, planning—and moderate impairment in emotional/behavioral functioning.

¶12 Marcus's report further indicates that Jackie's incapacity "interfere[s] with [her] ability to … receive and evaluate information[,]" "use

information in a decision process[,]" "protect … herself from abuse, exploitation, [or] neglect[,]" and "meet essential requirements of [her] health and safety[.]" The report also concludes that Jackie's "persistent psychotic symptoms … have presented a significant barrier to independent living."

¶13 James Persing, a licensed psychiatrist at the Trempealeau County Healthcare Center (TCHC), where Jackie was confined during her most recent commitment, testified next. He explained that Jackie's "underlying diagnosis is schizoaffective disorder[,]" that he prescribed her Prolixin Decanoate, "a long-acting injectable antipsychotic medication[,]" and that Jackie also receives Hydroxyzine, Lorazepam, and melatonin as needed. He testified that, when he first began treating Jackie, it was "very difficult" to have a "rational conversation" with her "because she was so preoccupied with hyperreligious content." However, Persing opined that, while Jackie "still has the hyperreligious overtones," she has "show[n] improvement during her stay[,]" and is "much better than she had been initially." When asked whether he believed Jackie is "responding to the medications positively[,]" he responded that he did. He explained that, with treatment, Jackie's "delusional thoughts" are "less intrusive" and that it is possible to have "somewhat of a rational conversation with her … and only under periods of stress or significant … questioning or lengthy discussion does the delusional thought content come out."

¶14 Persing confirmed that Jackie is "safe … on these medications[,]" but that "she necessitate[s] the use of psychotropic medication … to treat her symptoms" and that, without them, "[t]he intensity of [her] delusions would resume to a higher degree dominating more of her thoughts and ultimately behaviors." He testified that he explained the advantages, disadvantages, and alternatives to her course of medications, and that, while Jackie is "able to

understand [this information] … she's not able to really apply that understanding to her own situation[]" because, due to her mental illness, "[s]he does not have the insight available to … understand[] where she's at with regard to her symptoms and mental illness." When asked whether Jackie has "acknowledged … that these medications have been beneficial to her[,]" Persing responded, "[a]bsolutely not" and stated that Jackie attributes her "heal[ing]" to God rather than to her medications. Persing stated that Jackie's preference would be "to take no medications."

¶15 The circuit court then heard testimony from Traci Risberg, a registered nurse at the TCHC who provided treatment for Jackie. Risberg testified that, apart from one incident in which Jackie initially refused to submit to a mouth check but ultimately relented, Jackie "is cooperative with taking her medications[.]" Risberg also testified that "[e]ach time after she takes the medications she always states[]" that she "believe[s] in God and Jesus's healing power[.]" When asked whether Jackie required persuading for her to take her medications, Risberg responded that Jackie used to be "more focused religiously about not needing medications" and would need to be reminded "that she is under a court order to take medications[,]" but that "at this point[,]" Jackie no longer requires coaxing.

¶16 Jackie's former landlord, John Tsoris, testified next. He stated that Jackie was one of his tenants but that he had recently given her notice that he was "not renewing her lease." When asked why, he identified "a couple [of] incidents" in which burners on Jackie's stove "were left on." On one occasion, Tsoris smelled gas and knocked on Jackie's door but she would not let him in. He testified that tenants "sometimes budge the [gas] knob," but that two occurrences of burners being left on "close in proximity" was unusual. He agreed that leaving

the gas on creates a "dangerous situation in the apartment building[.]" He described her apartment as "not well-kept" and confirmed that he was concerned about her safety. Tsoris also stated that Jackie once left him a note stating that "if [he] didn't give [Jackie] $10,000 that [he] wouldn't get home safe." He explained that he did not take the note to mean "that [Jackie] was going to physically assault [him] in any way," but rather that Jackie was "curs[ing]" him.

¶17     The circuit court then heard testimony from McCormick, an adult protective services agent employed by the Ozaukee County Department of Human Services. McCormick became involved with Jackie after she was committed in July 2023 and prepared a report in connection with the guardianship and protective placement petitions. In conducting her evaluation, McCormick met with Jackie, reviewed law enforcement records and her treatment records, and spoke with her family, former landlord, and treatment providers at TCHC.

¶18     McCormick testified that, during the interview, Jackie indicated that she had been committed in the past as an act of persecution for her having "testified to being the bride of Christ." Jackie also told McCormick "she had slit her wrists" in the past but "that it was okay because it was stated in the Bible so that was all right." McCormick recounted Jackie stating "that she was forced to have treatment" and "that she felt as though she was being … forced to participate in treatment because she was high on the Lord."

¶19     From the law enforcement records McCormick reviewed, she expressed concern about

> an incident where she was trespassing at a business and was
> ripping flags out of the ground. When officers went there
> to speak with her she ran into traffic in an attempt to evade
> the officers. And when they had to physically restrain her,

she was -- the report indicated that she was laughing and barking at them.

McCormick also testified that Jackie "does not believe she has a mental illness or that she needs medication" and that she had plans with her family to obtain an apartment near them if she was released, which her family denied. Based upon her work on Jackie's case, McCormick did not "believe she would seek appropriate medical care if it was necessary" because of "her delusions and religious preoccupation[.]"

¶20 Finally, the circuit court heard testimony from Windi Matagi, a licensed practical nurse at TCHC who treated Jackie. Matagi testified that, on one occasion, she observed Jackie object to taking medication. Matagi explained that Jackie "had a new order for an injection of the Fluphenazine" that Matagi was supposed to administer, but Jackie "adamantly declined to allow [her] to do that." Matagi testified that Jackie told her she didn't need the injection and that "she forcefully said no and … slam[med] her hand down on the desk door one time and also walked away from [her] a couple times, three times or four times." When counsel asked Matagi if Jackie indicated why she believed she didn't need the injection, Matagi testified that Jackie told her that "she believes in God and Jesus's healing power[,]" and that "she does not believe that she is crazy."

¶21 Following Matagi's testimony, the circuit court took judicial notice of the fact "that [Jackie] was under commitment in Ozaukee County case number 2008-ME-208 from 2008 to 2022 and then recommitted again in 2023-ME-65 and continues under commitment at this time."

¶22 Following arguments of counsel and Meyer, the circuit court granted the County's petitions and gave the following reasons for its decision:

THE COURT: All right. Well, it is difficult because I'm not making any kind of judgment on [Jackie's] firm belief that God and Jesus have healing power and it's through them that she's healed; however, the problem comes into it this way, she's not healed. She might have been healed from some pain in her knee and I think her back, but what we're talking about is a mental illness that she does not have any insight to; and because of the mental illness she lacks that capacity to have insight to the mental illness which then further is complicated because she can't really receive and evaluate information and that impairs her ability to make decisions for her way of living.

Now, we heard a couple different examples that were of concern. On two separate occasions where the gas was left on or the burners in the apartment, running into traffic, it's that irrational thinking that is of a real concern for the Court in terms of if the guardianship would be appropriate. I find it is, that the County has come forward with enough testimony to support that. … I do think the County has met its burden in regards to the guardianship.

And then in terms of the protective placement, I will find that she's in need of residential care and custody because of that irrational behavior and thought process … and that at this time it will be an order for a locked facility. And clearly she can be moved at the appropriate time. Right now, it will be that order as that would be the least restrictive. And the involuntary medication order is also appropriate.

I guess history is always a good indication of future behavior and in this case we've heard testimony that when she wasn't under a commitment, she went off her medications and quickly starting decompensating and … there were dangerous activities because of that. So I will grant the involuntary med order as well.

¶23    On January 11, 2014, the circuit court entered orders granting the petitions for protective placement, guardianship, and involuntary medication. Jackie then filed a postdisposition motion pursuant to WIS. STAT. RULE 809.30(2)(h) asserting that her lawyer rendered ineffective assistance at the hearing by failing to object to numerous instances of hearsay testimony. The court denied the motion without a hearing in a written decision, concluding that the

testimony Jackie challenged was either corroborated by other evidence or did not prejudice her.  Jackie appeals.

## STANDARD OF REVIEW

¶24    "A circuit court's decision on whether to appoint a guardian involves a determination by the court based on the court's review of the facts of the case." *Robin K. v. Lamanda M.*, 2006 WI 68, ¶12, 291 Wis. 2d 333, 718 N.W.2d 38. "[This] determination is within the discretion of the circuit court judge[,]" and this court "give[s] deference to the circuit court's factual findings unless clearly erroneous." *Id.*  However, "[w]hether the circuit court applied the correct legal standard in exercising its discretion presents a question of law, which we review de novo." *Id.* (citation omitted).

¶25    This court reviews the circuit court's decision on a protective placement under a mixed standard of review.  *See Coston v. Joseph P.*, 222 Wis. 2d 1, 22-23, 586 N.W.2d 52 (Ct. App. 1998).  Factual findings will not be set aside unless clearly erroneous.  WIS. STAT. § 805.17(2).  We review de novo the legal question of whether the evidence meets the requirements for protective placement. *Coston*, 222 Wis. 2d at 23.

## DISCUSSION

### I. Involuntary Medication Order

¶26    In her supplemental brief, Jackie informed us that "the circuit court entered an order discontinuing [her] involuntary medication" in January 2025. Because Jackie is no longer subject to the involuntary medication order entered on January 10, 2014, the parties agree that her appeal of that order is moot. "Appellate courts generally decline to reach the merits of an issue that has become

moot." ***PRN Assocs. LLC v. DOA***, 2009 WI 53, ¶29, 317 Wis. 2d 656, 766 N.W.2d 559. We are not convinced that we should review the order under any recognized exception to Wisconsin's mootness doctrine. Accordingly, we dismiss Jackie's appeal of the withdrawn involuntary medication order, including her constitutional challenge to WIS. STAT. § 55.14(3)(e)1.

## II. Guardianship of the Person and Estate

¶27 The County sought the appointment of a guardian for Jackie on the basis of incompetency. The circuit court "may appoint a guardian of the person or a guardian of the estate, or both, for an individual based on a finding that the individual is incompetent only if" the County proves four elements set forth in WIS. STAT. § 54.10(3)(a) by clear and convincing evidence. *See* § 54.10(3)(a)1.-4. Jackie contends that the County's evidence was insufficient to establish either type of guardianship.

¶28 With respect to guardianship over her person, Jackie focuses on the statutory requirement that the County prove that "because of an impairment, [she] is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that [she] is unable to meet the essential requirements for … her physical health and safety." *See* WIS. STAT. § 54.10(3)(a)2. Jackie concedes that the evidence established that her schizoaffective disorder is an impairment[3] for purposes of the guardianship statute. But she argues that the County failed to show a causal connection between that

---

[3] An "impairment" under WIS. STAT. ch. 54 is defined as "a developmental disability, serious and persistent mental illness, degenerative brain disorder, or other like incapacities." WIS. STAT. § 54.01(14).

impairment and her supposed inability to effectively "receive and evaluate information or to make or communicate decisions." *See id.* Jackie contends that, "[s]etting … speculative averments aside, the record consists entirely of evidence that was impermissibly vague, inadmissible hearsay, or both."

¶29    First, Jackie contends that Marcus's testimony did not establish that Jackie is "incapable of receiving and evaluating information" generally, but instead only with respect to whether she has a mental illness. Jackie argues that, "[a]side from this single example, the County did not otherwise prove that [she] could not receive and evaluate information necessary to independently function in the world."

¶30    Jackie seems to suggest that she must be found to be "categorically" or "wholly" incapable of receiving and evaluating information in order for the statutory requirement to be met. However, the text of WIS. STAT. § 54.10(3)(a)2. does not require complete or categorial incapacity. Instead, that provision is satisfied if an individual's inability to receive and evaluate information makes them "unable to meet the essential requirements for his or her physical health and safety." *Id.* An individual is unable to "[m]eet the essential requirements for physical health or safety" if he or she cannot "perform those actions necessary to provide the health care, food, shelter, clothes, personal hygiene, and other care without which serious physical injury or illness will likely occur." WIS. STAT. § 54.01(19).

¶31    Moreover, Jackie's characterization of the evidence is inapposite. In his report, Marcus noted deficits in Jackie's "recollection of past events" due to "pervasive delusional beliefs[.]" He noted that Jackie exhibited "[m]oderate to severe impairment of reasoning" and that Jackie was "dismissive of safety

concerns … repeatedly stat[ing] that she has been healed by God[.]" Marcus's report also notes "[a]t least moderate impairment [of emotional and behavioral functioning]." Only after these observations does Marcus separately note Jackie's "poor" insight into the "presence and nature of her mental illness[.]" Marcus therefore testified to, and noted in his report, several deficiencies which tend to indicate that Jackie is unable to effectively receive and evaluate information and to make decisions and clearly stated his opinion that those deficiencies are caused by Jackie's mental illness. Since Jackie lacks insight into her mental illness and does not believe she requires medical treatment, and since she rapidly decompensates after abstaining from treatment, Jackie is rendered incapable of making reasoned decisions pertaining to her health and safety, and she sometimes engages in risky or dangerous behavior. Jackie's impaired functioning is also likely to diminish her ability to hold employment and provide for her financial well-being.

¶32 Jackie also asserts that the evidence presented was insufficient to support an order for guardianship of her estate. To obtain such an order, the County had to prove that Jackie's impairment renders her "unable effectively to receive and evaluate information or to make or communicate decisions related to management of … her property or financial affairs, to the extent that" she (1) "has property that will be dissipated in whole or in part"; (2) "is unable to provide for … her support"; or (3) "is unable to prevent financial exploitation." *See* WIS. STAT. § 54.10(3)(a)3.a.-c. Jackie asserts that Marcus's testimony was "generic," "imprecis[e]," and consisted only of his mere "belie[f]" that she satisfied the statutory criteria. Similarly, she faults McCormick for not providing "descriptive or sufficiently reliable evidence of [Jackie's] incapacity" to manage her financial affairs. In response, the County asserts that it presented evidence sufficient to

15

appoint a guardian under the second criteria, namely that Jackie's mental illness renders her unable to provide for her support. We agree.

¶33    When asked whether Jackie would be able to "receive and evaluate information and make decisions … to protect herself from [financial] exploitation and meet her needs[,]" Marcus responded that he did not "believe she's able to do those things[,]" and agreed with counsel that she is unable to do so "for the same reason she's not able to care for her [other] needs[,]" namely her deficiencies in executive functioning and reasoning caused by her schizoaffective disorder. Jackie insists that Marcus provided "scant" testimony on the issue of her ability to manage her property or financial affairs, but her argument suggests that he needed to identify actual instances in which Jackie mismanaged her finances. The appointment of a guardian over a person's estate under WIS. STAT. ch. 54 does not require such evidence. It requires only evidence that an individual's impairment makes them "unable effectively to receive and evaluate information or to make or communicate decisions related to management of his or her property or financial affairs, to the extent that," as relevant here, "[t]he individual is unable to provide for his or her support." WIS. STAT. § 54.10(3)(a)3.b. Based upon his interactions with Jackie and other information about her mental health condition and level of functioning, Marcus opined that her schizoaffective disorder created moderate to severe impairments in the areas of reasoning and executive functioning. The record indicates that although Jackie lived in an apartment before she was recommitted in 2023, she was reliant on others to ensure that her rent was paid. No evidence in the record indicates that she was gainfully employed before her recommitment in 2023. The circuit court could conclude from Marcus's testimony and report that her moderate to severe impairments in reasoning and executive

functioning render her unable to exercise the judgment and do the planning necessary to support herself financially.

¶34 Jackie next characterizes McCormick's testimony regarding Jackie's ability to provide for her own financial support as "vague." She also challenges McCormick's testimony regarding an incident in which Jackie allegedly attempted to "overdraw funds [from a financial institution] that weren't available to her" as inadmissible hearsay. Even if we agreed with this characterization of the testimony, other evidence in the record is sufficient to support the appointment of a guardianship over her estate.

¶35 While Jackie notes that her landlord "offered no examples of missed rent" and that "his decision not to renew [Jackie's] lease was not motivated by financial concerns[,]" she ignores his testimony that although Jackie's money was used to pay rent, "the County administers it." We do not see how this arrangement, if true, conflicts with other evidence and tends to prove that Jackie is capable of managing her finances.

¶36 Jackie also argues that the circuit court "failed to make sufficient findings to support the guardianship order[.]" First, she suggests that the court misstated the language in WIS. STAT. § 54.10(3)(a)2. by finding that Jackie "can't really receive and evaluate information and that impairs her ability to make decisions for her way of living." Jackie asserts that the court should have replaced the words "way of living" with "physical health and safety" to better track the language of the statute and that failing to do so rendered the finding insufficient.

¶37 We are not persuaded by Jackie's argument. Our state supreme court has rejected the notion that circuit courts and litigants must use "magic words" for orders to be properly supported. *See, e.g.*, ***Marathon County v. D.K.***,

2020 WI 8, ¶54, 390 Wis. 2d 50, 937 N.W.2d 901.  Instead, courts look to whether a circuit court or an expert witness truly "misstate[d] the substance of the standard[,]" or instead "merely failed to recite it exactly."  ***Id.***  Immediately after the court made the comment regarding Jackie not being able to "make decisions for her way of living[,]" the court referenced Jackie leaving the gas on in her apartment and running into traffic, stating that "it's that irrational thinking that is of a real concern for the Court[.]"  In context, it is clear that the court was finding that Jackie's ability to receive and evaluate information was impaired in such a way that she would be unable to properly make decisions regarding her health and safety.  We note further that the court checked a box on the guardianship order entered after the hearing that recites the substantive standard under WIS. STAT. § 54.10(3)(a)2., confirming that it determined that that standard had been satisfied.

¶38     Next, Jackie argues that the circuit court "wholly failed to consider" in its oral ruling the sixteen factors outlined in WIS. STAT. § 54.10(3)(c).  This one-sentence argument is not sufficiently developed to warrant a response.  *See* ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).  Jackie does not specify which of these factors the court purportedly failed to consider, and it is not our role to develop that argument for her.  *See* ***State v. Gulrud***, 140 Wis. 2d 721, 730, 412 N.W.2d 139 (1987).  We reject Jackie's arguments and conclude that the order for guardianship of Jackie's person and estate was supported by sufficient findings and evidence.

### III.  Protective Placement

¶39     We begin our discussion of the protective placement order by addressing the issue of mootness.  The County contends that Jackie's appeal of that order is moot, but concedes that several exceptions to our mootness doctrine

apply and permit us to address her substantive challenges to that order. Specifically, it suggests that her appeal raises issues of great public importance that are likely to arise again and may evade review. Jackie also argues that these exceptions apply. Based upon the parties' agreement, we will address the merits of her appeal.

¶40 Jackie challenges the sufficiency of the evidence to support the protective placement order. A circuit court may order protective placement for an adult individual who: (1) "has a primary need for residential care and custody"; (2) "has been determined to be incompetent by a circuit court"; (3) "[a]s a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacit[y], … is so totally incapable of providing for … her own care or custody as to create a substantial risk of serious harm to … herself or others"; and (4) "has a disability that is permanent or likely to be permanent." WIS. STAT. § 55.08(1)(a)-(d). As with a guardianship, these elements must be proved by clear and convincing evidence. WIS. STAT. § 55.10(4)(d).

¶41 Jackie focuses on the third element, contending that the County did not prove "that [her] mental health diagnosis rendered her so totally incapable of providing for her own care or custody as to create a substantial risk of serious harm to herself or others." Jackie notes that this element imposes a high burden, citing our decision in *Zander v. County of Eau Claire*, 87 Wis. 2d 503, 515, 275 N.W.2d 143 (Ct. App. 1979), in which we stated that

> [m]ere speculation as to difficulties [an individual] may encounter is not sufficient. Specific harm must be foreseeable to fulfill this requirement. Furthermore, the foreseeable harm must be serious. The minor accidents, injuries and illness are not sufficient to satisfy this requirement.

¶42 Here, the circuit court concluded that Jackie was in need of protective placement due to her "irrational behavior and thought process[.]" The court stated further that "history is always a good indication of future behavior and in this case we've heard testimony that when she wasn't under a commitment, she went off her medications and quickly started decompensating and … there were dangerous activities because of that." We understand the court to have been referring to the incidents in which Jackie twice left the gas burners on the stove in her apartment running until her landlord intervened. Jackie seems to suggest that this incident was inadmissible insofar as it was elicited from Marcus; however, Jackie's landlord also testified that it occurred. Marcus also testified about Jackie's inability to dress appropriately for cold weather and an incident in which she ran into the middle of a busy street. These are not "minor" incidents; they show that Jackie is incapable of taking care of herself to such an extent that a substantial probability exists that she will seriously harm herself without protective placement. The court did not err when it ordered protective placement.

¶43 Jackie also contends that the circuit court did not make sufficient findings to support the protective placement order. She characterizes the court's findings as "imprecise and generic" and argues that the court "did not specifically address" the four requirements for such an order under WIS. STAT. § 55.08(1)(a)-(d) and did not "evaluate testimony[] or make specific factual findings to support the order."

¶44 Although sparse, the circuit court's findings in its oral ruling, together with the findings in the order the court entered on the County's protective placement petition, are sufficient to support the order. In its oral ruling, the court referred to Jackie's "irrational behavior and thought process" as support for protective placement. The "irrational behavior" to which the court referred

consisted of Jackie repeatedly leaving her stove burners on and "running into traffic[.]" We understand the court's reference to irrational "thought process" to refer to the evidence concerning Jackie's lack of insight and inability to receive and evaluate information necessary to function independently, both of which result from her mental illness. The court also found specifically that Jackie was "in need of residential care and custody because of that irrational behavior and thought process[.]"

¶45 In addition to these references to evidence presented at the hearing, the circuit court concluded in its protective placement order that Jackie met the four criteria for protective placement set forth in WIS. STAT. § 55.08(1)(a)-(d). It reaffirmed that Jackie had "a primary need for residential care and custody." It noted that Jackie had been determined to be incompetent on January 10, 2024, less than one year before the County filed the protective placement petition. The court specifically concluded that Jackie's "serious and persistent mental illness" made her "so totally incapable of providing for [her] own care or custody as to create a substantial risk of serious harm to [herself] or others." And finally, the court determined that Jackie's disability was "permanent or likely to be permanent." Though the court could have made a more fulsome oral record of its findings as to each of the statutory criteria, we conclude that the oral ruling and order contain sufficient findings to support protective placement.

### III. Ineffective Assistance

¶46 Finally, Jackie asserts that the circuit court erred when it denied her postdisposition motion, in which she alleged that her counsel had rendered ineffective assistance, without a hearing. She contends that she was entitled to a hearing on her motion because it sufficiently alleged deficient performance and

prejudice. The court may deny a postdisposition motion without a hearing "if the defendant fails to allege sufficient facts … or presents only conclusionary allegations, or if the record conclusively demonstrates that the [movant] is not entitled to relief[.]" *Smith v. State*, 60 Wis. 2d 373, 378, 210 N.W.2d 678 (1973).

¶47 Claims of ineffective assistance of counsel in Wisconsin are analyzed under the two-prong test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the party raising ineffective assistance must prove that counsel performed "deficiently"—that is, below "an objective standard of reasonableness." *Id.* at 688. The moving party must also establish that the deficient performance prejudiced him—that is, but for the deficient performance, "there is a reasonable probability that, … the result of the proceeding would have been different." *Id.* at 694. An ineffective assistance of counsel claim presents a mixed question of fact and law. *State v. Pitsch*, 124 Wis. 2d 628, 633-34, 369 N.W.2d 711 (1985). This court "will not reverse the circuit court's findings of fact … unless they are clearly erroneous." *Id.* at 634. Questions of law are reviewed de novo. *Id.*

¶48 First, Jackie's motion claimed that "Marcus's testimony contained several instances of clear-cut hearsay or testimony otherwise not based on his personal knowledge" and that Marcus was "used as a conduit for information that he either recited from treatment records or learned … from … other non-testifying witnesses[.]" The motion identified, as unobjected-to hearsay, the following five statements made by Marcus in his testimony:

- At the time Jackie was recommitted in July 2023, she made "statements about care going forward and that she did not believe she had what is fairly obvious that she did have";

- "When [Jackie] had her [WIS. STAT. ch.] 51 order terminated, she stopped medication that had previously been helpful for her and she decompensated";

- "And in the past, including prior to [Jackie's] detention, she had a fairly protracted period of decompensation that was progressive and the likelihood of that occurring again is very high";

- "[Jackie] was facing, as I understand it, eviction from her apartment building. She was leaving the apartment improperly clothed to my knowledge"; and

- "[Jackie] had been off of treatment, it had been about a year I believe. It was a slow decompensation, but that is my understanding."

In its decision denying Jackie's motion, the circuit court addressed these statements and determined that "the [C]ounty in its response to the motion clearly demonstrated … that first, any of the hearsay was harmless and second … the hearsay was corroborated by other witnesses … and third [Jackie] has not shown a reasonable probability the outcome would have been different."

¶49    We agree that Marcus's testimony about Jackie "not believ[ing] she had what is fairly obvious that she did have" was cumulative of other evidence showing that Jackie lacked insight and awareness into the existence and nature of her mental illness. Marcus testified directly to this point when he stated that, in his meeting with Jackie, she "did not recognize the mental illness issue whatsoever." He also noted Jackie's lack of insight into her mental illness in his reports, which were properly admitted. Because of the other admissible evidence

on this point, Jackie's counsel's failure to object to this testimony did not prejudice her.

¶50    The next statement, that Jackie had stopped taking medications after her commitment order ended, was likewise corroborated and the absence of an objection was not prejudicial. When Marcus was asked by counsel whether Jackie "acknowledged [during the interview] that she had stopped treatment when she had gotten off of her mental health commitment[,]" Marcus responded that "[s]he did." The second statement was thus duplicative of other admissible evidence and Jackie did not establish that her counsel's failure to object to it prejudiced her.

¶51    The third challenged statement, that Jackie decompensated after being released from commitment, was also corroborated by other evidence. McCormick's evaluation noted that Jackie suffered from "a cycle of mental health episodes where [she] would stop taking her medications, decompensate to the point of being hospitalized …, get released under forced treatment, comply for a short while and then stop the medication starting the cycle over again." McCormick testified that she knew Jackie "was continually recommitted … because there were suicide attempts, noncompliance with treatment, [and] lack of developed insight into her mental health[.]" Thus, the lack of an objection by counsel did not prejudice Jackie.

¶52    The next statement is comprised of two separate assertions, that Jackie went outside improperly clothed and that Jackie was evicted from her apartment building. The circuit court likely did not rely on either of these statements, since, even if they were admissible, these statements were contradicted by other, more direct evidence. When Jackie's landlord was asked whether Jackie ever dressed inappropriately for conditions, he stated that he "wouldn't say she

didn't … [wear] proper attire for the weather[.]" He also provided testimony which clarified that he did not initiate eviction proceedings against Jackie; rather, he declined to renew her lease when it terminated. Given the landlord's clarifications on these points, there is no reasonable probability that the outcome of the proceeding would have been different had Jackie's counsel objected to Marcus's testimony.

¶53 Finally, Jackie challenges Marcus's statement that Jackie suffered a slow decompensation while being off of treatment for approximately one year. The County concedes that this statement constituted inadmissible hearsay, but argues that Jackie failed to demonstrate prejudice since the assertion that Jackie was in a decompensated state when placed under commitment in 2023 was independently supported by Dr. Persing's testimony, and it can be presumed that the circuit court relied on properly admitted evidence. This court agrees.

¶54 Next, Jackie challenges certain statements elicited during Risberg's testimony as inadmissible hearsay. Specifically, she objects to the statement, which Risberg based upon treatment records, that in a specific instance there were "difficulties with getting [Jackie] to accept the IM that was prescribed by her physician[,]" and that Jackie "was argumentative and did not want to have an injection." Again, while this statement was based upon review of treatment records and was thus hearsay, Risberg provided other testimony grounded in her personal knowledge about Jackie's tendency to refuse medication. Risberg testified that she observed Jackie refusing to take medication on at least one occasion and also testified regarding Jackie's belief that medication was unnecessary and that she was being healed by God. Matagi also testified that Jackie once "adamantly declined" an injection and "slam[med] her hand down on the desk[.]" We presume the circuit court relied on the ample, properly admitted

evidence that Jackie has a history of refusing prescribed medication. Thus, her counsel's failure to object to Risberg's hearsay testimony did not prejudice her.

¶55     Jackie's motion also challenged as hearsay McCormick's testimony that Jackie's family told McCormick that no plans existed for Jackie to move close to them and to obtain an apartment. However, the circuit court correctly determined that Jackie failed to prove that this statement was prejudicial, since, immediately prior to this statement, McCormick testified directly that Jackie made inconsistent statements regarding the existence of a plan to move and because McCormick also testified that she believed Jackie did not have a "realistic plan." Thus, the County argued, and the court apparently agreed, that sufficient direct testimony supported McCormick's opinion "that she did not believe [Jackie] was capable of making arrangements for herself."

¶56     Finally, Jackie's motion challenged the admission of Marcus's physician's reports. The court determined that Jackie's "complaint of Dr. Marcus' report does not … allege anything specific as to how any hearsay in Dr. Marcus' report was relied on by the court or prejudice[d] her." This court agrees. Jackie does little beyond describing every instance of hearsay in Marcus's reports and fails to establish that the court relied on specific hearsay statements that were not corroborated by other admissible evidence.

## CONCLUSION

¶57     For the reasons explained above, we conclude that Jackie's appeal of her involuntary medication order is moot and dismiss that portion of her appeal. We further conclude that the County presented sufficient evidence to support the guardianship and protective placement orders, and that the circuit court's findings were sufficient to support those orders. Finally, we conclude that the court did not

err when it denied Jackie's postdisposition motion alleging ineffective assistance of counsel.

*By the Court.*—Appeal dismissed in part; orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.