COURT OF APPEALS
DECISION
DATED AND FILED

February 3, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2025AP1532**

STATE OF WISCONSIN

Cir. Ct. No. 2025GN12

IN COURT OF APPEALS
DISTRICT III

---

IN THE MATTER OF THE CONDITION OF M. S.:

BROWN COUNTY,

    PETITIONER-RESPONDENT,

  V.

M. S.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Brown County: TAMMY JO HOCK, Judge. *Affirmed*.

¶1 HRUZ, J.[1] Matthew[2] appeals an order for his protective placement pursuant to WIS. STAT. ch. 55. Matthew argues that Brown County failed to present sufficient evidence that he is in need of protective placement. We affirm.

## BACKGROUND

¶2 In January 2025, the County filed a petition for temporary guardianship of Matthew due to his incompetency. The petition alleged that a guardianship was necessary because Matthew's power of attorney (POA) agent was "not fulfilling duties regarding healthcare decisions and financial matters." After a hearing on the petition, the circuit court issued an order for temporary corporate guardianship of Matthew's person and estate.

¶3 In February 2025, the County filed petitions for Matthew's permanent guardianship and for his protective placement. The County alleged that protective placement was necessary because Matthew had "a degenerative brain disorder and serious and persistent mental illness" and was "vulnerable to self-neglect without medication management and monitoring."

¶4 A hearing on the petitions was held in April 2025. Doctor Katie Olbinski, a psychologist, testified that she examined Matthew and reviewed collateral reports, and she opined that Matthew has a permanent incapacity of "[s]erious and persistent mental illness, specifically bipolar disorder, and other like capacities including [a] mild neurocognitive disorder most likely due to chronic

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

mental health issues, medications, and medical complications." She further opined that the mental illness causes impairments to Matthew's "attention and concentration, communication, memory, reasoning, executive functioning, and emotional and behavioral functioning."

¶5     Doctor Olbinski opined that Matthew's incapacity interferes with his ability to effectively receive and evaluate information, his ability to make and communicate decisions, his ability to meet essential requirements for his health or safety, and his ability to manage property or financial affairs.[3] Olbinski further surmised that Matthew was not able to provide for his own support, that he was not able to prevent any sort of financial exploitation, and that he needs a decisionmaker for both medical and financial decisions. Olbinski then concluded that Matthew requires protective placement and that he has a primary need for residential care and custody due to his bipolar disorder and mild neurocognitive disorder.

¶6     When asked to explain why Matthew has a primary need for residential care and custody, Dr. Olbinski stated,

> Prior to his placement at the nursing home[,] he struggled to meet his needs independently in the community, even with some informal supports. His cognitive impairment

___

[3] In her report, Dr. Olbinski explained that Matthew's impairments result in incapacities because

> [Matthew's] disorganized thought process, limited insight, and impairment in reasoning and executive functioning limit[] his ability to process information. He shows poor comprehension of his overall needs and his safety risks. He has not been effectively managing his finances. He has not been able to provide information needed for additional state/federal benefits which has create[d] concerns at his placement. He is at risk of exploitation.

> and mental health issues create a substantial risk of him
> having self-neglect or inadvertently endangering himself or
> the community without the level of residential care.

When asked if Matthew is "so totally incapable of attending to his own care and custody as to create a substantial risk of serious harm to himself or someone else," Olbinski answered, "Yes."

¶7    Doctor Olbinski's report was received into evidence without objection. In her report, Olbinski noted that the County first became involved with Matthew in August 2024 due to Matthew being "in a manic state" and "acting out" by making "sexually inappropriate gestures towards other tenants." Olbinski also noted that in September 2024, there were concerns that Matthew was suffering from "memory issues," was forgetting if he had eaten, was forgetting to take his medications without prompting, and was fearful of showering without assistance due to a fear of falling.[4] The report stated that, as of September 2024, Matthew had not been taking his psychotropic medications "for at least a year." The report also stated that protective placement was necessary because "[Matthew] was not meeting his health and safety needs when living independently, even with informal supports from family. Per collateral [reports], the informal supports have not been able to assist on a level that would prevent [Matthew] from needing residential care and custody."

¶8    Deborah Meyer, a social worker for the County, testified that she was assigned Matthew's case. Meyer stated that she was concerned that Matthew's POA agent for health care and for finances was not fulfilling his duties,

---

[4] Doctor Olbinski's report also noted that Matthew's service providers were concerned about him having dementia symptoms.

4

which caused the County to file for guardianship. Meyer also expressed concern that the POA agent was financially abusing Matthew.

¶9      Meyer completed a comprehensive evaluation of Matthew that was received into evidence without objection. The report primarily focused on the ways in which Matthew's POA agent was failing to fulfill his duties, but it also noted that Matthew "has a history of not taking his medications, including psychotropic medications and antirejection medications for his kidney and liver transplants,"[5] and "has a history of manic behaviors and a history of expressing suicidal statements."

¶10      The circuit court determined that there was a need for guardianship and for protective placement. The court found that Matthew is incompetent, that his disability is likely to be permanent, and that Matthew

> has a primary need for residential care and custody as a result of both the serious and persistent mental illness that has been referred to as well as other like incapacities, and those issues render [Matthew] so totally incapable of providing for his own care or custody as to create a substantial risk of serious harm to himself.

¶11      Matthew now appeals the order for his protective placement.[6]

---

[5] We note that Dr. Olbinski's report stated Matthew's medical history was "significant for hypertension, hyperlipidemia, atrial fibrillation, impaired fasting blood sugar, bipolar disorder, hepatic encephalopathy/chronic hepatitis C/hepatorenal syndrome/status post liver transplant/history of alcohol dependence in remission, edema, mild cognitive impairment, and nicotine addiction."

[6] The circuit court ultimately ordered the appointment of a guardian of the person and of the estate. Matthew does not contest the guardianship order on appeal. We address the evidence pertaining to the guardianship only to the extent necessary to address the sufficiency of the evidence related to the protective placement.

**DISCUSSION**

¶12    Matthew argues that the County failed to present sufficient evidence to prove that he is in need of protective placement.[7]    Specifically, Matthew contends that the County failed to present specific facts showing that his overall condition created a substantial risk of serious harm.[8]

¶13    Our review of a protective placement order presents a mixed question of fact and law.  *See Walworth County v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377.  We will uphold the circuit court's factual findings unless they are clearly erroneous.  *Id.*  "A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence."  *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784.  Whether the evidence satisfies the legal standard for protective placement is a question of law that we review de novo.  *Therese B.*, 267 Wis. 2d 310, ¶21.

¶14    As relevant to this appeal, in order to protectively place an individual, the circuit court must find, by clear and convincing evidence, that:

> [a]s a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like

---

[7] Citing *Langlade County v. D.J.W.*, 2020 WI 41, ¶40, 391 Wis. 2d 231, 942 N.W.2d 277, Matthew also argues that the circuit court failed to make specific factual findings to support its protective placement order.  We note that *D.J.W.* concerned an involuntary commitment under WIS. STAT. ch. 51, *see D.J.W.*, 391 Wis. 2d 231, ¶¶2-3, whereas Matthew's appeal concerns a protective placement under WIS. STAT. ch. 55.  Matthew does not cite any cases applying the *D.J.W.* standard to protective placements under ch. 55; thus, we reject this argument as undeveloped.  *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

[8] Matthew does not contest that he has a primary need for residential care and custody, that he is an individual who has been determined to be incompetent by a circuit court, and that he has a disability that is permanent or likely to be permanent.

6

> incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others. Serious harm may be evidenced by overt acts or acts of omission.

WIS. STAT. §§ 55.08(1)(c), 55.10(4)(d). The risk of harm under § 55.08(1)(c) "must be substantial. Mere speculation as to difficulties [the individual] may encounter is not sufficient. Specific harm must be foreseeable to fulfill this requirement. Furthermore, the foreseeable harm must be serious." *Zander v. County of Eau Claire*, 87 Wis. 2d 503, 514-15, 275 N.W.2d 143 (Ct. App. 1979).

¶15 Matthew argues that the evidence presented by the County consisted of conclusory statements that failed to show how his incapacities created a substantial risk of serious harm and involved concerns that did not rise to the level of serious harm. Matthew contends that Dr. Olbinski's testimony lacked specificity, that Meyer's testimony related more to his need for a guardianship, and that both Olbinski's and Meyer's reports presented "no evidence whatsoever that [Matthew] was ever seriously injured or faced serious physical harm."

¶16 We disagree with Matthew's above assertions and conclude that the totality of the evidence established that Matthew is an individual who meets the criteria in WIS. STAT. § 55.08(1)(c). While Dr. Olbinski's hearing testimony may have consisted of general, statutory language, her ultimate, expert opinion was that Matthew's incapacities create a substantial risk of serious harm. Importantly, that opinion is supported by specific facts from both her report and Meyer's report.

¶17 Notably, Dr. Olbinski's report states that Matthew is a liver and kidney transplant recipient, that he had been drinking alcohol, and that he has a history of excessive alcohol consumption. Indeed, the record includes reports of Matthew consuming alcohol in the period leading to the petition for his protective

placement. Meyer's report further states that Matthew has a history of not taking his antirejection medications for his transplants. Matthew dismisses these facts because the record does not contain any evidence that, even given the foregoing, he has in fact been harmed. But an individual's failure to take medically prescribed medications to ensure that a serious health condition does not occur—i.e., the body rejecting transplanted organs—is a valid basis upon which to conclude that a substantial risk of serious harm is present. The same is true regarding the risks associated with alcohol consumption by someone who has had his liver and kidneys removed.

¶18 Further, both Dr. Olbinski's and Meyer's reports state that Matthew is exhibiting issues with his memory. Olbinski's report specifies that Matthew forgets to take his medication and that he forgets if he has eaten. Her report also notes concerns that Matthew may be suffering from dementia.

¶19 Meyer's report states that Matthew "has a history of manic behaviors and a history of expressing suicidal statements." Doctor Olbinski's report states that Matthew was in a manic state as recently as August 2024 and that, shortly thereafter, Matthew was evicted from his home. Olbinski's report also states that Matthew is "fearful of showering without assistance" and that "[h]e does not usually participate in activities of daily living (ADLs) and cleanliness," needing assistance with some dressing and grooming. The report, in classifying the impairment to Matthew's executive functioning as "severe," also noted that "[p]rior to his hospital placement, [he] struggled to organize his daily and instrumental living activities." According to Olbinski's report, Matthew also denied or minimized many of his specific behaviors reflecting his mania.

¶20    Matthew attempts to discount the foregoing by arguing that the County failed to develop these concerns at the hearing. Citing **Wood County v. Zebulon K.**, Nos. 2011AP2387, 2011AP2394, unpublished slip op., ¶¶12-15 (WI App Feb. 7, 2013), he further argues that the failure to provide for one's own care does not rise to the level of a substantial risk of serious harm.[9]

¶21    While the County certainly could have further developed the above facts at the hearing, we conclude that it sufficiently proved that Matthew's incapacities create a substantial risk of serious harm. The record reflects that Matthew has consistently struggled with ADLs and his cleanliness, such that Matthew was unable to satisfy his health and safety needs even with informal support from his family. While Matthew is correct that concerns for his hygiene, alone, may not rise to the level of presenting a substantial risk of serious harm, the evidence presented at the hearing rose far above merely showing that he is unable to provide for his own care. Specifically, in addition to the evidence that Matthew struggles with his ADLs and is fearful of showering alone, the record shows that he is suffering from memory issues, causing medical staff to have concerns that he is suffering from dementia, which also appears to have contributed to some of Matthew's issues with taking his necessary medication. Further, he has a recent history of being manic, denying and minimizing his manic behaviors, and expressing suicidal statements.

---

[9] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

¶22 While any one of these behaviors, alone, might not satisfy the requirement that Matthew's incapacities create a substantial risk of serious harm, the collective weight of each of these concerns satisfies that burden.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.