COURT OF APPEALS
DECISION
DATED AND FILED

June 18, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP303**

**STATE OF WISCONSIN**

Cir. Ct. No. 2021GN36

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE GUARDIANSHIP AND PROTECTIVE PLACEMENT OF P.A.E.:

LA CROSSE COUNTY,

    PETITIONER-RESPONDENT,

  V.

P.A.E.,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for La Crosse County: RAMONA A. GONZALEZ, Judge. *Reversed*.

¶1     KLOPPENBURG, J.[1] P.A.E. appeals an order continuing her protective placement. P.A.E. argues that there was insufficient evidence to support a continuation of her protective placement. As explained below, the record establishes that La Crosse County failed to prove by clear and convincing evidence that P.A.E. was so totally incapable of providing for her own care or custody as to create a substantial risk of serious harm to herself or others, as required by WIS. STAT. § 55.08(1)(c). Accordingly, I reverse the order continuing P.A.E.'s protective placement.

## BACKGROUND

¶2     P.A.E. has been subject to a guardianship of her person since May 2021.[2] In July 2022, P.A.E. was protectively placed pursuant to WIS. STAT. ch. 55.

¶3     In May 2024, the County petitioned for the second annual review of P.A.E.'s protective placement. The guardian ad litem (GAL) appointed for P.A.E. filed a report and recommendation stating that P.A.E. was contesting her placement, requesting an independent evaluation, and requesting a full due process hearing.

¶4     In August 2024, the circuit court held a due process hearing to review P.A.E.'s protective placement. Two witnesses testified at the hearing: the psychologist who examined P.A.E. before the hearing, whose report was also

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] P.A.E. is not challenging her guardianship.

entered into evidence, and P.A.E.'s corporate guardian. Their testimony is described in detail in the discussion that follows. After the close of evidence, the County argued that P.A.E.'s protective placement should be continued, P.A.E.'s counsel argued that the County failed to meet its burden of showing that the standards for continuing protective placement were met, and the GAL recommended that the court continue the protective placement.

¶5 On September 18, 2024, the circuit court granted the County's petition for continued protective placement. P.A.E. appeals.[3]

## DISCUSSION

¶6 This court's review of an order continuing a protective placement presents a mixed question of law and fact. *Walworth County v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377. "The circuit court's factual findings will not be overturned unless clearly erroneous." *Coston v. Joseph P.*, 222 Wis. 2d 1, 22, 586 N.W.2d 52 (Ct. App. 1998) (citing WIS. STAT. § 805.17(2)). The issue of whether the evidence satisfies the legal standard for

---

[3] Given the passage of time that is significant for the nature of the case, I now briefly explain the timeline since the circuit court issued the order continuing protective placement on September 18, 2024. P.A.E. timely filed a notice of intent to pursue postdisposition relief from that order and filed the notice of appeal in February 2025. After the parties completed their appellate briefing, the appeal was submitted to this court in June 2025, approximately nine months after entry of the protective placement order. The appeal was assigned to me in May 2026. Given this history, another annual review of the protective placement should have occurred by now. *See State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.*, 122 Wis. 2d 65, 84-85, 362 N.W.2d 104 (1985) (requiring an annual review of the necessity of a protective placement and, if necessary, a "full due process hearing" on the need for continued protective placement). Because protective placement cases are confidential, I do not have access to any information about what has occurred since the record was transmitted to this court in March 2025. Neither party has informed this court that this appeal may be moot or otherwise affected by any such annual review. Accordingly, I address the appeal as submitted.

continued protective placement is a question of law that this court reviews de novo. *Coston*, 222 Wis. 2d at 23.

¶7    "'Protective placement' means a placement that is made to provide for the care and custody of an individual." WIS. STAT. § 55.01(6).  A circuit court may order the continuation of a protective placement if the court finds, by clear and convincing evidence, that the individual continues to meet all four standards set forth in WIS. STAT. § 55.08(1):

> (a) The individual has a primary need for residential care and custody.
>
> (b) The individual … is an adult who has been determined to be incompetent by a circuit court.
>
> (c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others.  Serious harm may be evidenced by overt acts or acts of omission.
>
> (d) The individual has a disability that is permanent or likely to be permanent.

*See also* WIS. STAT. § 55.10(4)(d) (setting standard of proof).

¶8    Here, P.A.E. challenges only whether the third standard, WIS. STAT. § 55.08(1)(c), was proven by clear and convincing evidence.  Specifically, P.A.E. argues that the County failed to present sufficient evidence to show that as a result of her mental illness, she was so totally incapable of providing for her own care or custody that she posed a substantial risk of serious harm to herself or others.  *See* § 55.08(1)(c).  Under this standard, "[t]he risk of harm must be substantial.  Mere speculation as to difficulties [that an individual] may encounter is not sufficient. Specific harm must be foreseeable to fulfill this requirement." *Zander v. County*

*of Eau Claire*, 87 Wis. 2d 503, 514-15, 275 N.W.2d 143 (Ct. App. 1979). "The harm envisioned … must be directly foreseeable from the overt acts or omissions of the individual." *K.N.K. v. Buhler*, 139 Wis. 2d 190, 202, 407 N.W.2d 281 (Ct. App. 1987). Moreover, "the foreseeable harm must be serious.… [M]inor accidents, injuries and illness are not sufficient to satisfy this requirement." *Zander*, 87 Wis. 2d at 515.

*Additional Background*

¶9    I present here pertinent parts of the testimony offered at the hearing, the psychologist's report, and the circuit court's decision and reasoning.

¶10    At the hearing in August 2024, the County's first witness was Dr. Michael Lace, the psychologist who independently examined P.A.E. The following information is taken from Lace's testimony at the hearing and his report entered into evidence at the hearing. Eleven days before the hearing, Lace met with P.A.E. virtually over Zoom for approximately 45 minutes. He reviewed P.A.E.'s medical records and past evaluations and "did a mental status exam [of P.A.E.] that was fairly intense in terms of measuring cognitive functioning."

¶11    Based on the records and examination, Dr. Lace concluded that P.A.E. has a history of schizophrenia, conversion disorder, anxiety disorder, bipolar disorder, and an unspecified cognitive disorder. P.A.E. also reported symptoms of depression and posttraumatic stress disorder, and she reported that she occasionally hears whispers that "say different things like 'keep your faith.'" In addition, P.A.E. has a variety of medical diagnoses, including cardiac issues, asthma, diabetes, and hypertension. Records show a history of medication noncompliance. P.A.E.'s impairments are likely to be permanent, and they make

her "unable to effectively receive and evaluate information and make or communicate decisions related to her physical health and safety."

¶12   During Dr. Lace's examination of P.A.E., P.A.E. "demonstrated below-average to borderline intellectual functioning" and her "[m]emory was severely impaired." "She is effectively unable to read and demonstrated very limited … basic math computation skills," as well as weak reasoning and executive functioning. P.A.E.'s "insight and judgment were fairly limited, [and she] really wasn't able to discuss … with any specificity her medical problems or any of her limitations." P.A.E. did say that she occasionally uses a walker and wheelchair and that she cannot breathe very well, but she "didn't really understand any of the reasoning behind her current level of care" or why she was living in an adult family home. "She also does not appear to appreciate the nature or severity of her mental health conditions, which are quite severe," nor does she "appear to fully understand and appreciate the … consequences of her impairments." Lace opined that P.A.E. "would definitely need help with" the "essential requirements of her physical health and safety," and that she "remains not competent to make decisions regarding her physical health and safety."

¶13   Dr. Lace further opined that while P.A.E. is "not aggressive or suicidal or homicidal or anything like that," and would not cause "active harm" to herself or others, she would cause harm "more through likely neglect and not [being] able to consistently provide for herself." Both P.A.E.'s short-term memory and long-term memory are "quite weak." Lace's "main concern" with respect to whether P.A.E. was so incapable of providing for her own care or custody as to create a substantial risk of serious harm to herself or others "would be in th[e] two areas[ of] insight and judgment, understanding … what her medical challenges are, and then memory being very limited."

6

¶14    P.A.E. "didn't believe that there'd be any problem living fully independently," but Dr. Lace was concerned "that it would be likely that there'd be forgetting of – medication management would be difficult, perhaps forget to take pills, forget appointments or not feel like they're very important, and then memory, remembering to do things that would – could create dangerous situations."

¶15    Dr. Lace opined that P.A.E. "definitely needs assistance and I think that would need to be likely 24/7 care," but that if that were available in the community, he believed P.A.E. might "do okay" with protective services rather than protective placement.  Without 24/7 care, Lace did not believe anything less than protective placement would be appropriate "given [P.A.E.'s] memory problems, which were really quite severe.  And in terms of her judgment and insight into her problems … and not really knowing that she even had a history of schizophrenia, much less managing those symptoms when they occur, so I would be hesitant about [protective services short of 24/7 care]."

¶16    On cross-examination, Dr. Lace testified as follows.  P.A.E. did not show signs of "active paranoia or delusional thinking [and] didn't seem to be hallucinating either."  P.A.E. "was able to communicate her thoughts effectively," and "her information processing, while slow, was generally accurate."  Lace did not have an opportunity to observe P.A.E.'s living space or to observe her walking around or participating in activities; his only time meeting with her was over Zoom.

¶17    Tonya Olson, P.A.E.'s corporate guardian, testified as follows.  Olson had been P.A.E.'s guardian for approximately three years, and she interacts with P.A.E. once every three months.  P.A.E. had previously been placed in a

memory care unit in a nursing home, but she made enough improvement to be moved into an adult family home, where she had been residing for less than a year. She was doing well in her current placement. P.A.E. goes "out in the community with her housemates and the staff" and "has gone home with her fiancé," but they were "going to take a little bit of a break with that." Olson was concerned that if P.A.E. were to live independently, either with her fiancé or apart from him, P.A.E. might not take her medications, not shower, and not make it to the bathroom in time. In addition, P.A.E. has wounds on her legs that Olson was concerned that P.A.E. would not get "taken care of," and Olson was concerned that P.A.E. would not have transportation to doctor's appointments, either for the wounds or other concerns. Olson was not aware of any 24/7 in-home services that would be available to P.A.E.

¶18 On cross-examination, Olson testified as follows. She had not looked into any in-home services for P.A.E. recently, but when the family care agency had tried to send services to P.A.E.'s home in 2021, P.A.E. would refuse to allow the service providers to enter her home. When Olson goes to see P.A.E. once every three months, Olson "physically go[es] to [P.A.E.'s] facility and ha[s] a conversation with her." The one-on-one conversations typically range from 15 to 30 minutes. Alternatively, once every six months, or every other time that Olson goes to the facility, Olson has a meeting with "the rest of the team," which includes P.A.E.'s case manager, the program manager, and P.A.E., and those meetings last from an hour to an hour and a half.

¶19 On re-direct examination, Olson testified that, at the team meetings every six months, P.A.E. is "very active," and they talk about medications, doctor's appointments, activities of daily living, and P.A.E.'s relationship with her

fiancé. In addition, P.A.E. recently "expressed interest in gaining employment[,] so that is in the works."

¶20 After hearing the testimony of the two witnesses, the recommendation of the GAL in favor of continuing the protective placement, and argument from the County and from P.A.E.'s counsel, and receiving Dr. Lace's report in evidence, the circuit court explained its decision as follows. In deciding whether the County met its burden of showing by clear and convincing evidence that P.A.E. is so incapable of providing for her own care or custody as to pose a substantial risk of serious harm to herself or others, the court may consider "the totality of the circumstances including the history of this case." P.A.E. "has a very poor understanding of what [her persistent mental illness] means," and "the [c]ourt can take into consideration where we were … in 2022 when she had what she's asking me for today, living with [her fiancé], is a woman who had got down to 100 pounds, covered with feces, living in a trailer thinking it was just okay."

¶21 The circuit court further stated that P.A.E.'s improved condition "has a lot to do with the fact that rather than listen to her disregard her mental care, disregard her medical care, she is in a place where those needs are being met." The court directed Olson "to continue to look and see if we can find something even less restrictive for [P.A.E.], but we are nowhere near dismissing this protective placement to allow [P.A.E.] to put herself in mortal danger, which I believe the evidence demonstrates." The results of cognitive testing are "very clear that she has significant deficits, and those are not deficits that improve over time." P.A.E. is "never going to be happy with a placement[,] … as a result of her serious and persistent mental illness and the fact that she doesn't think that there's anything wrong. So why should she take medications and why are we letting her do this."

¶22    The circuit court concluded:

> I don't know whether there's any way to get her to understand that she does suffer from a mental illness and that she must take her medications without monitoring and that if she doesn't she puts herself in mortal danger…. [W]e have gone through many different placements and we continue to have this issue because of her cognitive and mental health challenges, but I don't think because of that the [C]ounty should not be more astute in how they present this case going forward. Somebody needs to testify more particularly because I'm not going to be here to know this history. I will be gone for the next one and no other judge is going to take the time to review this file and to be up to speed to be able to evaluate the testimony that is being given. But for today I am going to find that she does meet the standards for protective placement, that she has a primary need for residential care and custody as a result of a serious and persistent mental illness and that the least restrictive placement is the current placement.

*Analysis*

¶23    The question on appeal is whether the County proved, by clear and convincing evidence, that P.A.E., because of her disability, was "so totally incapable of providing for … her own care or custody as to create a substantial risk of serious harm to … herself or others," as required by WIS. STAT. § 55.08(1)(c). As stated, this standard requires that the County present evidence identifying a specific, foreseeable, and serious harm and showing that the risk of harm was substantial. *See Zander*, 87 Wis. 2d at 514-15.

¶24    Relying on evidence introduced at previous hearings, the circuit court found that P.A.E. had lost significant weight and was living in unsanitary conditions before her protective placement, has significant cognitive deficits, and has poor insight into her mental illnesses and does not understand that she has a mental illness and that she needs to take medication, and that if she does not take her medication, she "puts herself in mortal danger." In addition, the testimony and

report that were implicitly credited by the circuit court show that P.A.E. might neglect to care for herself in the areas of showering and taking her medication; that she might not be "able to consistently provide for herself"; that she might forget or choose not to take her medication; that she might forget to or be unable to attend doctor's appointments; and that she may otherwise forget things that could lead to "dangerous situations."

¶25    As I now explain, these facts found or credited by the circuit court are either not supported by the record or, as a matter of law, not sufficient to show that P.A.E. was unable to care for herself so as to create a substantial risk of serious harm to herself or others because they do not identify a specific, foreseeable, and serious harm and show that the risk of harm was substantial.

¶26    *Losing weight and living in unsanitary conditions.*  The circuit court found that, in 2022, before P.A.E.'s protective placement, she "had got down to 100 pounds, covered with feces."  While this is not supported by any evidence introduced at the hearing, we note that at least one persuasive opinion concluded that the court may rely on reports and documents admitted into evidence in the individual's prior protective placement proceedings, as well as on the court's own previously found adjudicative facts.  *See **Douglas County v. J.M.**,* No. 2022AP2035, unpublished slip op., ¶¶20, 27-28 (WI App Nov. 28, 2023).[4]  It is not clear from the court's comments whether these facts were previously adjudicated or what evidence they are based on, but P.A.E. does not argue that these findings are clearly erroneous.  *See **id.**,* ¶28 (encouraging circuit courts to

---

[4] *See* WIS. STAT. RULE 809.23(3)(b) (permitting the citation of authored, unpublished opinions issued after July 1, 2009, for their persuasive value).

explain on the record "why and how" it is relying on previously admitted documents or adjudicated facts and what it is basing its findings on).  Accordingly, we assume that reports or adjudicated facts from P.A.E.'s earlier protective placement proceedings support these findings.

¶27     An individual's "pattern" of behavior, whether or not that pattern is recent, may suffice to show a substantial risk of serious harm.  *K.N.K.*, 139 Wis. 2d at 203.  However, there is no evidence in the record, nor did the circuit court find, that the fact that P.A.E. was in a certain condition before her protective placement establishes a pattern or that there is a substantial risk that P.A.E. would return to that condition absent a protective placement, given her guardianship and any necessary protective services. *Compare id.* at 203 (K.N.K. exhibited a pattern over the course of 20 years of stopping her medication, becoming delusional, and taking actions that placed her and others at risk of serious harm, including attempting to jump out of a moving vehicle, leaving a vehicle running in a closed garage, and turning the heat off in the middle of winter).

¶28     The fact that P.A.E. weighed 100 pounds does not establish a substantial risk of serious harm because the evidence does not show what a healthy weight is for P.A.E., or that the weight loss was caused by specific acts or omissions due to P.A.E.'s lack of capacity to provide for her care or custody. While being "covered with feces" is clearly unsanitary and could cause serious harm and illness to P.A.E., the circuit court's findings do not elaborate on what exactly this finding entailed, nor did the court find that it was foreseeable that the condition was likely to recur if P.A.E. was not protectively placed. *See Zander*, 87 Wis. 2d at 515 ("Specific harm must be foreseeable … [and] the foreseeable harm must be serious.").  The court did find that the improvement in P.A.E.'s condition, also testified to by Olson, was due in large part to her protective

placement and the services she was receiving, but the court did not cite evidence to support a finding that P.A.E. would decompensate to the level she was at before the protective placement if the protective placement was discontinued. And, my review of the record reveals no such evidence. Accordingly, this finding of P.A.E.'s condition before her protective placement does not rise to the level of clear and convincing evidence that P.A.E. would create a substantial risk of serious harm to herself or others if not protectively placed. Moreover, it would defeat the purpose of the annual review if evidence of the individual's condition before the protective placement was sufficient to demonstrate that the individual continued to meet the standards for protective placement.

¶29 *Lack of insight into mental illnesses and medication noncompliance.* The circuit court's finding that P.A.E. does not understand that she has mental illnesses and that she needs to take medication to address those mental illnesses is not clearly erroneous. However, the court's finding that by failing to take her medication, P.A.E. "puts herself in mortal danger," is not supported by any evidence in the record or by more specific findings by the court. The County did not present evidence, and the court did not make any findings, as to what medications P.A.E. is taking or what specific symptoms or behaviors would occur if she stopped taking those medications. Without such evidence or specific findings, there is no basis in the record to conclude that the possibility that P.A.E. would not take her medication presents a substantial risk of serious harm to herself or others. *See Outagamie Cnty. DHHS v. L.C.E.*, No. 2023AP929, unpublished slip op., ¶15 (WI App June 4, 2024) (general statements that individual might stop taking medication without specifying symptoms or behaviors or how those concerns would lead to serious harm is insufficient to meet Wis. Stat. § 55.08(1)(c) standard); *Washburn County v. D.C.R.*, No. 2024AP2443-FT,

unpublished slip op., ¶33 (WI App July 8, 2025) (without additional evidence tying failure to take medication to a substantial risk of serious harm, evidence of not taking medication is insufficient to meet § 55.08(1)(c) standard); ***Clark County v. R.D.S.***, No. 2022AP229, unpublished slip op., ¶¶13-14 (WI App Aug. 18, 2022) (testimony that individual might stop taking medication and "become more paranoid," without more, is insufficient to meet § 55.08(1)(c) standard).

¶30     *Additional information.*   Although not explicitly credited by the circuit court, I briefly address the following evidence presented at the hearing and explain why it is not sufficient to meet the substantial risk of serious harm standard set forth in WIS. STAT. § 55.08(1)(c).   Olson testified that she was concerned that without a protective placement, P.A.E. might not shower or make it to the bathroom in time.   However, Olson did not discuss what specific, foreseeable, and serious harm would result from these failures, and on their own, they do not rise to the level of serious harm.   *See **R.D.S.***, No. 2022AP229, ¶¶17, 19 (failure to shower on its own does not pose risk of danger sufficient to meet § 55.08(1)(c) standard).   This evidence instead supports P.A.E.'s primary need for residential care and custody under § 55.08(1)(a), a distinct requirement that P.A.E. concedes the County proved.   *See **Jackson Cnty. DHHS v. Susan H.***, 2010 WI App 82, ¶16, 326 Wis. 2d 246, 785 N.W.2d 677 (explaining that "primary need for residential care and custody" means that the person needs their "daily needs" provided in a residential setting and needs "someone else exercising control and supervision in that residential setting for the purpose of protecting the person from … self-neglect").   While this evidence shows that P.A.E. may require someone else to exercise control and supervision to protect her from self-neglect, the evidence does not show that the self-neglect described by Olson regarding

14

showering and making it to the bathroom in time would lead to a substantial risk of serious harm. *See Zander*, 87 Wis. 2d at 515 ("the foreseeable harm must be serious").

¶31 Olson and Dr. Lace both testified that they were concerned that P.A.E. might not attend her doctor's appointments, either because she would forget, not have transportation, or not feel like they were important. Again, neither witness testified as to what specific, foreseeable, and serious harm would result from missing doctor's appointments. Without downplaying the importance of attending medical appointments, I conclude that these facts alone do not show a substantial risk of serious harm and, similarly to the showering and bathroom concerns, instead support P.A.E.'s primary need for residential care and custody. *See D.C.R.*, No. 2024AP2443-FT, ¶¶22, 27-28, 31-37 (concluding that individual's need for assistance scheduling and attending medical appointments, among other things, sufficed to show that he had a primary need for residential care and custody, but did not support finding of substantial risk of serious harm). Olson's testimony regarding the wounds on P.A.E.'s legs that cause her pain similarly does not show that the wounds or the pain rise to the level of serious harm. *See Zander*, 87 Wis. 2d at 515 ("minor accidents, injuries and illness are not sufficient").

¶32 Dr. Lace testified that he was concerned that P.A.E. might not "remember[] to do things that … could create dangerous situations" and that she might not be able to "provide for herself." Aside from the specific concerns regarding taking her medication and attending doctor's appointments addressed above, Lace did not testify as to any specific things P.A.E. might forget to do, or what would occur if she could not "provide for herself." This testimony is too vague and speculative to show that P.A.E. is so totally incapable of providing for

her own care or custody as to pose a substantial risk of serious harm to herself or others. *See **L.C.E.***, No. 2023AP929, ¶15 (general testimony that individual would be vulnerable to abuse by others and might not be able to perform all activities of daily living is too vague and speculative to meet the WIS. STAT. § 55.08(1)(c) standard).

¶33 Finally, Olson's testimony that she was not aware of any 24/7 in-home services that would be available to P.A.E. was conclusory, and the circuit court did not find that appropriate protective services were not available to address Olson's and Dr. Lace's concerns. Nor was there any evidence that the protective services that would be available were not sufficient to prevent P.A.E. from decompensating in specific ways that would pose a substantial risk of serious harm to her.

¶34 The County argues that the evidence was sufficient to support a finding that P.A.E. would pose a substantial risk of serious harm to herself because it shows that she would not take her medication, and a person who does not treat their cardiac issues, diabetes, or hypertension "risks death." The County's argument fails for at least the reason that there is no evidence that P.A.E. is taking medication for her cardiac issues, diabetes, or hypertension, or any evidence of what specific symptoms would follow from her failure to take any such medication. The County also argues that it is "clear, specific, and foreseeable" that if P.A.E. does not properly tend to her leg wounds, she risks infection. Again, the evidence is insufficient to support this assertion. The County argues that P.A.E. has a demonstrated history of not allowing people into her home to assist her, and that this shows that she would pose a substantial risk of serious harm to herself or others. This argument is undeveloped, and I reject it on that basis. *See*

*Techworks, LLC v. Wille*, 2009 WI App 101, ¶27, 318 Wis. 2d 488, 770 N.W.2d 727 (this court is not required to entertain undeveloped arguments).

¶35    The County further argues that the circuit court's inference that P.A.E. "would revert to her previous condition based on her extensive list of medical conditions, her lack of insight into those conditions or her need for assistance, and her history of refusing in-home assistance" was reasonable and not an unsupported assumption.  However, the evidence introduced at the hearing showed that P.A.E. was "active[ly]" involved in conversations about her medications, doctor's appointments, activities of daily living, and gaining employment.  Neither the witnesses' testimony nor the psychologist's report provided evidence that P.A.E. was likely to revert to her previous condition, and the court did not explicitly find that P.A.E. was likely to revert to her previous condition.  As explained above, there is simply not clear and convincing evidence that P.A.E. is so totally incapable of providing for her own care or custody as to pose a substantial risk of serious harm to herself or others.

¶36    It is evident that P.A.E. generally has significant physical and mental health issues, but the record here does not establish that the County showed by clear and convincing evidence that, if not protectively placed, P.A.E. would be so totally incapable of providing for her own care or custody as to create a substantial risk of serious harm to herself or others.  As the circuit court itself observed, the County would need to present more specific and detailed testimony and evidence in order to develop a record that does so establish.

## CONCLUSION

¶37    For the reasons stated, I reverse the order for P.A.E.'s protective placement.

*By the Court.*—Order reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.